IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-1541
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

GEORGE F. DILLMAN and
WILLIAM C. HATFIELD,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court for the
Northern District of Texas

_____

(February 16, 1994)

Before SNEED[*], REYNALDO G. GARZA, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

     The appellants are former officers of a savings and loan association.  They challenge their convictions for conspiracy, bank fraud, money laundering, and other crimes arising from an elaborate scheme to improve artificially the financial condition of the savings and loan association that they managed and to enrich themselves at the association's expense.  Because we find no reversible error, we affirm the appellants' convictions.

_____

     [*]Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit sitting by designation.

George Dillman was the chairman and W. C. Hatfield was the executive vice-chairman of Caprock Savings and Loan Association ("Caprock"), which had offices in Dallas and Lubbock, Texas. Caprock experienced financial difficulties in late 1988. Dillman wanted to remedy these difficulties in part by having Caprock participate in a business deal, the Southwest Plan, that promised handsome profits. To participate in the Southwest Plan, however, Caprock would have to demonstrate a better financial position than it actually had at that time.

In November 1988, Dillman met with Mukesh Assomull, a self-styled "facilitator" of problem-solving for savings and loan associations, to explore methods of improving the appearance of Caprock's balance sheet. Assomull, who admitted his participation in the scheme and testified for the government, stated that he and Dillman discussed how they and the other conspirators would use approximately $15 million of loans from Caprock to produce approximately $5 million worth of capital for the institution. The scheme, as initially envisioned by the parties, involved three stages: removal, laundering, and disbursement of Caprock's money. First, the conspirators would remove money from Caprock through artificially large loans used to fund fraudulent land deals. Second, the conspirators would launder the money through several bank accounts in order to disguise the original source of the money--Caprock. Third, the

conspirators would disburse a portion of Caprock's own money to be invested in Caprock as "capital" and keep a portion of the money themselves. This injection of Caprock's own money back into the savings and loan would make Caprock's balance sheet appear to reflect a superior financial position than actually existed.

Assomull testified that in later meetings in Dallas on November 7, 1988, with Dillman, Hatfield, Louise Kopy, and other persons not party to this appeal,[1] Dillman outlined the above general scheme to Hatfield who was agreeable. The conspirators discussed the use of shell corporations to buy land from third parties at fair market value and sell it to related shell corporations for notes reflecting artificially high values. These notes would then be sold to Caprock for their artificially high face values, thus removing the funds from Caprock. Next, the conspirators discussed the use of various domestic and foreign bank accounts and entities through which they would launder Caprock's money, thus disguising the true source of the money. It was at this point that Commercial Capital Ltd. ("Commercial Capital"), a shell corporation controlled by Assomull, became important to the scheme. According to Assomull,

---

[1]Namely, Anthony Nims and Kevin Hird. The jury acquitted Nims, who worked at Caprock's Lubbock office. Hird, Caprock's chief lending officer, pled guilty to charges arising from the fraudulent inflation of Caprock's net worth. Also, Robert Savage, Caprock's chief financial officer, pled guilty to charges arising from the fraudulent inflation of Caprock's net worth.

Dillman and Hatfield agreed to launder a portion of Caprock's funds through Commercial Capital and then disburse those funds through "loans" to the defendants in order to fund the purchase of the stock of Caprock's parent corporation, Great West Banc Shares, Inc. ("Great West"), thus injecting Caprock's own money back into Caprock.

From November 1988 to August 1989, Caprock distributed approximately $20 million in the form of loans that ultimately resulted in approximately $5 million in capital being infused into Great West and thus, Caprock. In the removal stage of the scheme, Dillman, Hatfield, and other conspirators removed approximately $10 million (of the total $20 million) from Caprock to fund two specific fraudulent land deals--the Maxtor deal and the Santos deal. In each of these deals, one shell corporation purchased land from a third party at fair market value, sold the land to another shell corporation for a note that reflected an artificially inflated price, and then sold the note to Caprock at its artificially high face value.[2] Once they removed the money

---

[2]Maxtor Properties, Inc. ("Maxtor") purchased forty acres of land for $750,000 cash from an unrelated third party. Simultaneously, Maxtor sold this tract of land in two pieces for approximately $3,500,000 in notes to a shell corporation controlled by the conspirators. Maxtor then sold the notes to Caprock for face value in cash. In a similar transaction, Santos Associates, Inc. ("Santos") purchased thirty acres of land for $2,300,000 in cash from an unrelated third party. Santos simultaneously sold the land in tracts for notes totalling $6,700,000 to other business entities. Santos then sold the notes at face value to Caprock for cash. Thus, after these transactions, Caprock had paid out approximately $10,200,000 in

from Caprock, the conspirators launched the laundering stage of the scheme in which various portions of the $10 million passed through different accounts, including the Hoover-Eggleston III Trust ("H-E III Trust") and the Broadline account in New York, prior to ultimate disbursement. The conspirators placed a portion of the funds removed from Caprock in Commercial Capital. Finally, in the disbursement stage of the scheme, Commercial Capital loaned the conspirators some of the funds originally removed from Caprock in order to fund the purchase of Great West stock. Of the total $10 million, the conspirators disbursed approximately $1.5 million from Commercial Capital as stock-purchase loans, approximately $3.3 million to pay the actual purchase price of the parcels of land bought from third parties and the related closing costs, and approximately $5.4 million to pay themselves for their personal benefit. The Commercial Capital loans constituted a significant step in the overarching plan because it helped to create the appearance that the money the conspirators would use to inject into Caprock was not Caprock's own money but, instead, had come from an independent and legitimate third-party lender. In order to enhance this appearance of legitimacy, Dillman and Hatfield executed "loan"

---

cash in exchange for notes secured by property with a fair market value of only approximately $3,050,000.

documents with Commercial Capital in conjunction with obtaining the stock purchase money.[3]

The balance of the $20 million removed from Caprock passed through the H-E III Trust and the Broadline account, and provided the remaining approximate $3.5 million of capital, which was injected into Great West and thus, Caprock.  The indictment, however, did not mention the second $10 million of the overall $20 million removed from Caprock.

On August 1, 1989, regulatory authorities closed Caprock and placed it in a conservatorship.  After an examination of Caprock's financial records, federal authorities indicted Dillman, Hatfield, and several other defendants not parties to this appeal.

II

The defendants were indicted and pled not guilty to all counts.  They were then tried and found guilty by a jury of: (1) violating 18 U.S.C. § 371, conspiring to (a) misapply Caprock's funds, (b) participate improperly in a transaction involving Caprock, (c) commit bank fraud, and (d) engage in money laundering; (2) violating 18 U.S.C. § 1344, committing bank fraud; (3) violating 18 U.S.C. § 657, misapplying money belonging to a

---

[3]The "loan" documents, however, only provided Commercial Capital full recourse to Dillman's and Hatfield's personal assets for a portion of the total amount loaned. Further, although Hatfield made one interest payment on his loan, neither Dillman nor Hatfield ever paid any of the principal on their loans.

federally insured financial institution; (4) violating 18 U.S.C. § 1006, unlawful participation in a transaction involving a federally insured financial institution; and (5) violating 18 U.S.C. § 1956 for money laundering.  Additionally, the jury found Dillman guilty of violating 18 U.S.C. § 215--accepting a bribe in return for exercising influence on a federally insured financial institution. Dillman and Hatfield then brought this appeal.

## III

The appellants argue numerous grounds for reversal.  We have carefully examined each ground asserted by the appellants, and find no reversible error.

## A

First, the appellants argue that the district court committed error under Federal Rule of Criminal Procedure 15 in refusing to order the deposition of Kevin Finch.[4]  Finch was the manager of Commercial Capital from which Dillman and Hatfield obtained the "loans" that they used to purchase the Great West stock and, thus, inject capital into Caprock.  Dillman and Hatfield contend that Finch's testimony will support the central claim of their defense-- that they did not know the money that they borrowed from Commercial Capital to purchase Great West stock originally came from Caprock.

---

[4]Dillman and Hatfield made several Rule 15 motions regarding Finch.  The district court denied two of these motions before the trial and the last motion eight days into the trial. Thus, the district court, when last ruling on the motion, had substantial exposure to the facts in the case and to the significance of Finch's potential testimony.

To this end, Dillman and Hatfield contend that Finch would testify that he had represented to them that the money Commercial Capital loaned them came from independent sources with no relation to Caprock.

The appellants argue that reversal is required because, just as in United States v. Farfan-Carreon, 935 F.2d 678, 680 (5th Cir. 1991), there were "exceptional circumstances" compelling the district court to order Finch's deposition: (1) the anticipated witness was outside the subpoena power of the district court; and (2) the witness was threatened with prosecution if he entered the United States. Finch, who at the time was living in London, England, apparently had no intention of coming to this country because he was the subject of an investigation being conducted by United States' authorities. Further, the appellants argue that--even though not a required element--Finch's deposition would have been material to the determination of whether the appellants believed the stock-purchase loans to come from independent sources instead of Caprock.

Rule 15(a) provides in pertinent part:

> Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition . . . .

(Emphases added).

The word "may" signifies that the district court retains broad discretion in granting a Rule 15(a) motion and that the court should review these motions on a case-by-case basis, examining whether the particular characteristics of each case constitute "exceptional circumstances." United States v. Bello, 532 F.2d 422, 423 (5th Cir. 1976). The words "exceptional circumstances" bespeak that only in extraordinary cases will depositions be compelled. We have held, however, that circumstances such as those confronting us in this case--Finch is an unservable deponent who is unlikely to return to the United States--can be extraordinary. Farfan-Carreon, 935 F.2d. at 680.

Although, as we indicated in dicta in Farfan-Carreon, 935 F.2d. at 680, the textual words of Rule 15 do not expressly require "materiality," it is emphatically clear to us that the words "in the interest of justice" call for the deposition to offer evidence that is material. United States v. Drogoul, 1 F.3d 1546, 1552 (11th Cir. 1993) (requiring materiality); United States v. Ontiveros-Lucero, 621 F.Supp. 1037, 1038 (W.D. Tex. 1985) (requiring materiality), aff'd, 790 F.2d 891 (5th Cir. 1986). Indeed, in Farfan-Carreon, 935 F.2d at 680, we stated that the deposition was material. In this case, Finch's potential testimony could have been material as to the execution of the loan documents and his subsequent dealings with Dillman and Hatfield regarding the Commercial Capital loans.

Even assuming materiality, however, we find that any error committed by the district court to be harmless. Unlike the potential deponent's critical involvement with the defendant in FarFan-Carreon, 935 F.2d at 679, there was no evidence in this case that Finch attended the key meetings at Caprock in which Dillman and Hatfield discussed and agreed to the illegal scheme, including the purchase of Great west stock with Caprock's own funds.[5] Thus, even assuming the greatest benefit to the defendants from Finch's testimony, that testimony still could not have exculpated Dillman or Hatfield from their agreement to inflate unlawfully Caprock's net worth with its own money. Further, Finch could not have testified regarding the defendants' culpability in the actual removal of money from Caprock through the fraudulent land deals or the laundering of money through accounts that did not involve Commercial Capital. Finch's testimony, therefore, could only have focused on the acts of the defendants after they agreed to the illegal scheme--subsequent representations regarding the legitimacy of the loans, preparation of the loan documents, and the loan closing meetings where he may have been present. Even as it might relate to this part of the scheme, however, Finch's testimony would be cumulative in the light of Hatfield's own testimony regarding

---

[5]Dillman's brief indicates that Assomull admitted that Finch was present at a crucial time when the transaction was closed. The transcripts reveal, however, that Finch arrived in Dallas more than ten days after the key November 7 meetings at Caprock and possibly attended only the subsequent closing meetings that took place at the law offices of Caprock's counsel.

these documents and events, the testimony of Caprock's attorney, Nims, who was present at the meetings in which the Commercial Capital loans were closed and who was acquitted, the documentary evidence of the loans, and the vigorous cross-examination of Assomull by Dillman's and Hatfield's respective counsel. In view of the substantial documentary and testimonial evidence presented regarding all phases of the overarching scheme and the limited scope and cumulative nature of Finch's potential testimony, we hold that this case is not the rare one in which denial of a Rule 15 motion warrants reversal.[6] See Bello, 532 F.2d at 423 (refusing to reverse on Rule 15 grounds when the weight of evidence of guilt was such that potential testimony would not have had a "significant impact"); United States v. Hernandez-Escarsega, 886 F.2d 1560, 1570 (9th Cir. 1989) (refusing to reverse denial of Rule 15 motion due, in part, to cumulative nature of potential evidence), cert. denied, 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990).

B

Next, the appellants argue that the district court committed reversible error by not requiring the government to provide appellants with the grand jury transcript of Ms. Kopy regarding her recollection of the meetings at which the conspirators agreed to

---

[6] 2 CHARLES ALLEN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 243, p. 17 (1982) ("On appeal from a judgment of conviction defendant is entitled to review of an order on a Rule motion, but it will be rare that he will be able to persuade the appellate court that the trial court committed reversible error in denying defendant's motion to take a deposition . . .") (emphasis added).

the illegal scheme to inflate Caprock's net worth with its own money.  See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  The appellants contend that Ms. Kopy's testimony would have supported their claim that they had a solid basis for believing that the Commercial Capital loans were legitimate instead of being disguised disbursements of Caprock's own funds.  They claim that the transcript of Ms. Kopy's testimony would have refuted Assomull's testimony regarding the incriminating meetings.  When asked about Ms. Kopy's grand jury testimony regarding the meeting that Assomull and Hatfield attended, the government read from the transcript to the court that Ms. Kopy stated that she "didn't remember" and "[did not] recall that happening."  The district court then denied the appellants' Brady request for the transcript.

We will overturn this verdict based on this alleged discovery violation only if the appellants show that granting the Brady request would have produced a reasonable "probability sufficient to undermine the confidence in the outcome." United States v. Ellender, 947 F.2d 748, 756 (5th Cir. 1991).  Although exculpatory and impeachment evidence fall within the purview of Brady, neutral evidence does not.  United States v. Johnson, 872 F.2d 612, 619 (5th Cir. 1989).  See United States v. Rhodes, 569 F.2d 384, 388 (5th Cir.), cert. denied, 439 U.S. 844, 99 S.Ct. 138, 58 L.Ed.2d 143 (1978) (holding prosecutor had no Brady duty to disclose that a certain witness could not positively identify the defendant).

Ms. Kopy's statement--to the effect that she did not remember the meeting--is neutral, not exculpatory or impeaching in nature. Therefore, we hold that the evidence was not Brady material. In any event, the district court's refusal to grant the Brady request certainly does not undermine our confidence in the jury's verdicts.[7]

C

Next, the appellants argue that the district court committed reversible error by denying their motion to exclude evidence--which they claim is extrinsic--regarding the removal of the second $10 million, which was used to fund the balance of the $5 million of capital that the conspirators originally planned to inject back into Caprock. The first $10 million generated from the Maxtor and Santos land deals had only resulted in approximately $1.5 million

---

[7]Similarly, we hold that neither the district court's failure to examine the transcripts in camera nor its refusal to grant a second continuance to locate Ms. Kopy require reversal. First, the district court's refusal to grant in camera review of Ms. Kopy's statement that she could not recall an event does not require reversal because, even if the statement were Brady evidence, it would not be material but, instead, is simply inconclusive. See United States v. Gaston, 608 F.2d 607, 612 (5th Cir. 1979); United States v. Dinitz, 538 F.2d 1214, 1224 (5th Cir. 1976), cert. denied, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977). Second, the district court's refusal to grant a second continuance to locate Ms. Kopy does not require reversal because Dillman and Hatfield did not show that Ms. Kopy was "available and willing to testify." United States v. Shaw, 920 F.2d 1225, 1230 (5th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 2038. 114 L.Ed.2d 122 (1991). United States v. Botello, 991 F.2d 189, 193 (5th Cir. 1993) (citations omitted), cert. denied, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___ 62 U.S.L.W. 3471 (U.S. Jan. 18, 1994) (No. 93-5835). Indeed, the record here shows plainly that Ms. Kopy was unwilling to testify.

of capital for Caprock, thus, leaving an approximate shortfall of $3.5 million below original goal of inflating Caprock's net worth by approximately $5 million.[8]  The government submitted voluminous documentary evidence of the money laundering activities of Assomull and certain unindicted individuals and a chart showing the money flowing out of Caprock through the H-E III Trust, through the Broadline account, and finally into Great West, Caprock's parent.[9]

We review this evidentiary ruling under an abuse of discretion standard.  United States v. Jackson, 978 F.2d 903, 912-13 (5th Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 3055, 125 L.Ed.2d 739 (1993).  The admission into evidence of facts that do not concern the defendants, that are not inextricably intertwined with the overall criminal episode is reversible error if the admission prejudices the defendants.  United States v. Williams, 900 F.2d 823 (5th Cir. 1990); United States v. Torres, 685 F.2d 921, 924 (5th Cir. 1982).  Here, however, our review of the record shows that the path of the second $10 million was inextricably intertwined with the overall criminal scheme, and especially the use of the

---

[8]The funds not used to inflate Caprock's capital were used to pay for the purchase of the land from independent third parties, to pay for closing costs, and to enrich the various conspirators.

[9]The record is unclear as to whether the second $10 million also passed through Commercial Capital or through a different entity, Pacific Capital.  Nonetheless, the original source and ultimate destination of the funds and their undeniable path through the Broadline account show that the second $10 million was an important part of the overall scheme to inflate Caprock's net worth with $5 million of its own money.

Broadline account as the main laundering vehicle for the funds removed from Caprock. The second $10 million came from Caprock while Dillman served as the institution's chairman and Hatfield served as its executive vice-chairman, just as with the first $10 million. The money passed through the H-E III Trust and the Broadline account as did portions of the first $10 million. And, most importantly, this money provided the balance of the $5 million that Dillman, Hatfield, and Assomull originally schemed to inject into Caprock. Thus, we hold that the district court did not err in allowing the jury to see the entire scheme and its results.

D

Next, the appellants argue that the district court committed reversible error by denying their motion for a specific unanimity instruction regarding the particular criminal purpose of the conspiracy and, instead, giving only a general unanimity instruction with respect to all the charges.[10] Specifically, each

---

[10]The district court instructed the jury with respect to the conspiracy count as follows:

For you to find a defendant guilty of conspiracy, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: That two or more persons made an agreement to commit at least one of the following crimes: bank fraud, misapplication of funds, unlawful participation, or money laundering . . .

Second: That the defendant under consideration knew of the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

appellant contends on appeal that notwithstanding the general unanimity instruction given by the district court, there is the possibility that while all twelve jurors could agree that the defendant under consideration conspired to violate a statute, some of the twelve jurors could have believed that he only conspired to violate one particular statute, e.g., 18 U.S.C. § 1344, bank fraud, while others of the twelve jurors could have believed that he only conspired to violate another particular statute, e.g., 18 U.S.C. § 1956, money laundering.  Thus, there could have been a less than unanimous agreement among all twelve jurors as to which of the four substantive statutes the defendant under consideration conspired to violate.  See  United States v. Holley, 942 F.2d 916, 925-29 (5th Cir. 1991), cert. denied, ___ U.S. ___, 114 S.Ct. 77, 126 L.Ed.2d 45 (1993) (reversing for lack of unanimity instruction on nonconspiracy count with several potential alternative violative acts).

---

Third: That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment . . . .

(Emphasis added).

With respect to all the charges, the district court instructed the jury:

To return a verdict, it is necessary that each juror agree thereto.  In other words, your verdict must be unanimous.

The appellants' argument fails because it is based on a fundamental misunderstanding of the crux of a conspiracy charge under 18 U.S.C. § 371: The defendant's voluntary agreement with another or others to commit an offense against or to defraud the United States. It does not matter that a single conspiracy was comprised of several objects to which the defendant did not specifically agree to accomplish, if those acts were reasonably foreseeable. See United States v. All Star Indus., 962 F.2d 465, 478 (5th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). Once the defendant had joined the agreement, the acts of the other conspirators became his acts irrespective of whether he physically participated in those particular acts or expressly agreed to the various specific objectives that constituted the respective stages of the overarching conspiracy. See id. When twelve jurors believe beyond a reasonable doubt that the defendant under consideration agreed to achieve an ultimate criminal purpose against the United States, all jurors need not agree on which particular offenses that defendant intended personally to commit as long as there is but one conspiracy that encompasses the particular offenses charged.

The evidence here showed one overarching conspiracy that embodied a scheme encompassing several illegal acts to inflate Caprock's net worth with its own money. See United States v. Ellender, 947 F.2d 748, 759 (5th Cir. 1991) (stating that similar time frame, locations, co-conspirators, offenses, and overt acts

indicate one conspiracy). There is no question but that this object was in violation of the law of the United States--the inflation of Caprock's net worth with its own fraudulently obtained money. 18 U.S.C. § 1956 (1988 & Supp. IV 1992) (knowing use of proceeds from unlawful activity in a financial transaction--here, the inflation of Caprock's net worth with its own fraudulently removed and laundered money). The jury was instructed, effectively, that it must find with respect to each defendant that he joined this illegal conspiracy. This instruction was in accordance with the law. See Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942); United States v. Lyons, 703 F.2d 815, 821 (5th Cir. 1983); United States v. Elam, 678 F.2d 1234, 1250 (5th Cir. 1982); United States v. Murray, 618 F.2d 892, 898 (2d Cir. 1980); United States v. Bolts, 558 F.2d 316, 326 n.4 (5th Cir. 1977), cert. denied, 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978).[11]

E

---

[11]Hatfield tangentially argues that the jury should also have been instructed that it must unanimously agree on which overt act, or acts, he committed in furtherance of the conspiracy. Hatfield admitted that he purchased stock from Great West even though he denied having knowledge that the stock purchase money came from Caprock. Given his agreement to the overall conspiracy, the stock purchase was a sufficient overt act to warrant a conviction by the jury. See United States v. Khamis, 674 F.2d 390, 393 (5th Cir. 1982) (stating that "overt act" need not be illegal itself in order to be sufficient to sustain conspiracy conviction). Because Hatfield admitted to this and other overt acts, we find any error with respect to the overt act requirement harmless beyond a reasonable doubt. See Holley, 942 F.2d at 929.

Next, Dillman argues that the district court erred in instructing the jury on the requisite mental state for bank fraud, 18 U.S.C. § 1344, and for unlawful participation, 18 U.S.C. § 1006, respectively.  We find both of these contentions without merit.

With respect to the bank fraud count, the district court instructed the jury as follows:

> A statement or representation is "false" or "fraudulent" within the meaning of this statute when it pertains to a material fact; it is known to be untrue or is made with reckless indifference to its truth or falsity; and is made or caused to be made with intent to defraud.

Dillman contends this instruction did not require the jury to find that the defendants acted with specific intent as required by United States v. Saks, 964 F.2d 1514, 1518 (5th Cir. 1992).

We review this instruction to determine whether the district court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.  United States v. Stacey, 896 F.2d 75, 77 (5th Cir. 1990).  In United States v. Gunter, 876 F.2d 1113, 1120 (5th Cir.), cert. denied, 493 U.S. 871, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989), we approved the same jury instruction with respect to 18 U.S.C. § 1344 that the district court used in this case.  Similarly, in this case, the "reckless indifference" language in the instruction defined the degree of the defendant's knowledge of falsity of the statement--not the motive or mental state of the defendant in making and using the statement.

The "intent to defraud" language defined the mens rea.  This instruction was a correct statement of the law.

With respect to the unlawful participation count, the district court instructed the jury that it must find that the defendants acted with "intent to defraud."  The district court instructed the jury that to act with intent to defraud is "to act knowingly and voluntarily" and then referred the jury to the following definition of "intent to defraud" that was contained in another count:

> [T]o act . . . with the <u>specific intent</u> to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self.  It also means to act knowingly and with <u>specific intent</u> to deceive such that the natural tendency of the act causes injury to a financial institution, even though such act may not have been the defendant's motive.

(Emphases added).

Dillman contends that district court confused the jury by including the term "willfully" in its instructions for other specific intent counts but failing to include the term "willfully" in the unlawful participation charge.  In <u>United States v. Rochester</u>, 898 F.2d 971, 979 (5th Cir. 1990), we upheld a jury instruction regarding section 1006 that used cross-references instead of defining the requisite mens rea in each count separately because the instructions taken as a whole properly stated the specific intent requirement of section 1006.  Similarly, we find that the exclusion of the term "willfully" did not detract from the accuracy of the instruction or confuse the jury because the clear language of the instructions, taken as a whole, properly stated the applicable law: Section 1006

requires specific intent.  <u>Id.</u>  Thus, the specific section 1006 instruction serves as no basis for reversal.

F

Finally, Hatfield argues that the district court committed reversible error in denying his motion for severance.  In support of his motion for a separate trial, Hatfield submitted Dillman's affidavit, stating that if a separate trial were held, Dillman would testify at Hatfield's trial to the effect that Hatfield had no involvement in the illegal transactions.[12]  Dillman further averred that he would testify that Hatfield was not present at any meeting where the illegitimacy of the Commercial Capital loans--by which Caprock's own money was transferred effectively to Hatfield and used to purchase the Great West stock--was mentioned and that he always represented to Hatfield that the transactions at issue were legitimate.  Hatfield cites <u>Abbott v. Wainwright</u>, 616 F.2d 889 (5th Cir. 1980), in support of his contention that we should reverse for denial of severance because: (1) his central defense

---

[12]Fed. R. Crim. P. 14 provides in pertinent part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trial of counts, grant a severance of defendants or provide whatever other relief justice requires.

-21-

was that he did not know the transactions were illegal; (2) the only direct evidence of such knowledge was Assomull's testimony that Hatfield attended meetings where the illegal portion of the scheme were discussed and that Dillman had told Hatfield of the illegality of the scheme; and (3) the denial of his motion for severance deprived him of the only testimony, besides his own, that could have exculpated him.

To make out a prima facie case for severance to the district court, Hatfield must demonstrate a bona fide need for Dillman's testimony, and that Dillman would in fact testify at Hatfield's separate trial. United States v. Rocha, 916 F.2d 219, 232 (5th Cir. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991). We review the district court's denial of a motion for severance only for abuse of discretion. Rocha, 916 F.2d at 227. To demonstrate an abuse of discretion on a severance motion, Hatfield must bear the heavy burden of showing that he suffered "specific and compelling prejudice" against which the district court did not protect him and, as a result, his trial was unfair. Id.; United States v. Salomon, 609 F.2d 1172, 1175 (5th Cir. 1980). In making this determination, we consider, inter alia, the extent of the prejudice caused by the denial of the motion to sever and the impact of severance on judicial administration and economy. United States v. Daly, 756 F.2d 1076, 1080 (5th Cir.), cert. denied, 474 U.S. 1022, 106 S.Ct. 575, 88 L.Ed.2d 558 (1985).

First, Hatfield's evidence that he had a bona fide need of severance to obtain Dillman's testimony and that Dillman would in fact testify at his trial is not persuasive. Prior to the joint trial, Dillman stated only that he "may not" testify at a joint trial; it would depend, he said, "on testimony and evidence brought forth at that trial." Thus, the need for severance was not obvious prior to trial because there was the admitted possibility that Dillman might testify at a joint trial. Further, Dillman was not positive that he would testify for Hatfield even if a separate trial was granted: Dillman asserted that his willingness to testify at Hatfield's separate trial was conditioned on the facts and legal advice that he had prior to trial and, thus, could change after separate trials had begun. See Daly, 756 F.2d at 1080. Thus, that Dillman would testify as Hatfield's separate trial was by no means certain.

Second, Hatfield fails to show "compelling prejudice." We reach this conclusion because of the lack of candor reflected in Dillman's affidavit and because of the availability of other exculpating evidence. In Abbott, 616 F.2d at 890, the codefendant's exculpatory affidavit was entitled to significant weight in showing prejudice to Abbott because the codefendant acknowledged his own criminal conduct while exonerating Abbott. See Tifford v. Wainwright, 588 F.2d 954, 957 (5th Cir. 1979). In the instant case, Dillman's affidavit was in no sense self-incriminatory; it was in fact self-serving in that it states that

Assomull told Dillman that Commercial Capital was a legitimate entity with ample supply of cash from independent sources to loan to Caprock's officers in order to fund their purchases of Great West stock. See Daly, 756 F.2d 1076, 1080 (stating that self-serving nature of affidavit weighed against the defendant's claim of compelling prejudice due to lack of severance). Furthermore, Dillman's affidavit does not reflect the only exculpatory evidence available to Hatfield. Hatfield's counsel extensively cross-examined Assomull and examined other evidence regarding the incriminating meetings, and Hatfield testified fully on his own behalf regarding his involvement in the transactions that constituted the conspiracy at trial.[13] Moreover, even if the jury accepted that Dillman never explained the illegal portions of the scheme to Hatfield, the evidence of Hatfield's integral involvement in Caprock's management and, specifically, his approval of the fraudulent Maxtor and Santos loans, his partially nonrecourse borrowings from Commercial Capital, and his purchase of Great West stock was sufficient in and of itself to support conviction. See United States v. Coveney, 995 F.2d 578, 594 (5th Cir. 1993)

---

[13]The government suggests that Hatfield could have called Kevin Hird, Caprock's chief lending officer who was involved in the key meetings, as a witness. We find Hatfield's statement that he was unable to locate Hird and serve him with a subpoena unpersuasive. Hird had pled guilty to crimes arising out of the scheme to inflate Caprock's net worth with its own money and was either incarcerated or on probation at the time of the trial. Hatfield did not explain why he could not have located Hird through law enforcement or corrections authorities and obtained pertinent testimony from him.

(stating that conspiracy does not require proof of a specific agreement when such agreement can be inferred from the concert of action of the conspirators); United States v. Warner, 441 F.2d 821, 830 (5th Cir.) (stating that a conspiratorial agreement is generally not susceptible to direct proof and, instead, must be proven by competent circumstantial evidence including the acts of the conspirators themselves), cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). In the light of this evidence, we cannot say that Hatfield has established compelling prejudice by being denied the uncertain opportunity to proffer Dillman's possible testimony that Dillman never personally told Hatfield that the scheme involved Caprock's own money and was thus illegal.

In short, Hatfield has not borne his heavy burden of proving the need for a separate trial and the compelling prejudice caused by the lack of Dillman's potential testimony. Further, we note that the district court instructed the jury to consider the evidence against each defendant separately.[14]  See United States v.

---

[14]With respect to the requirement to consider the evidence against each defendant separately, the district court instructed the jury as follows:

> A separate crime is charged against one or more of the defendants in each count of the indictment. Each count, and the evidence pertaining to it, should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one or more of the defendants guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant. You must give separate consideration to the evidence as to each

Thomas, No. 91-8583, slip op. 2510, 2526 [___ F.3d ___, ___] (5th Cir. Jan. 25, 1994) (affirming denial of motion to sever where district court gave cautionary instruction to consider each defendant individually).  Finally, the voluminous record and extensive transcripts indicate that judicial economy was served by a joint trial.  See Daly, 756 F.2d at 1080.  Thus, the district court did not abuse its discretion in denying Hatfield's motion for severance.

## IV

For the reasons stated above, the appellants' convictions are

A F F I R M E D.

_____

defendant.

We note that the jury apparently followed this instruction in acquitting other defendants.