United States Court of Appeals
Fifth Circuit

**F I L E D**

August 29, 2006

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 05-70041

CLIFFORD ALLEN KIMMEL,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas

Before BARKSDALE, STEWART, and CLEMENT, Circuit Judges.

CARL E. STEWART, Circuit Judge:[*]

Clifford Allen Kimmel was indicted on six counts of capital murder for the murders of three

persons. Kimmel pleaded guilty and was subsequently sentenced to death. The district court denied

Kimmel's petition for habeas relief and denied his application for a Certificate of Appealability

---

[*]Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5th Cir. R.
47.5.4.

("COA"). Kimmel seeks a COA from this court on four grounds. For the following reasons, we deny the application.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of April 9, 1999, Kimmel and Derrick Murphy went to the apartment of their acquaintance, Rachel White, planning to commit robbery. They waited for several people to leave, and then approached the apartment and asked to use the phone. Murphy entered the apartment and pointed a gun at White and her two remaining guests, Susan Halverstadt and Brett Roe. After securing the victims' hands with rope, Murphy took White into the bathroom and demanded to know where she kept her money. When White resisted, Murphy injected her in the arm with a syringe containing cleaning fluid. Murphy then smothered White with a pillow until she stopped thrashing, and then he cut her neck. Thereafter, Kimmel injected Roe with cleaning fluid. When Roe attempted to run for the front door, Kimmel and Murphy tackled him and Kimmel stabbed him in the chest. Murphy took the knife from Kimmel, cut Roe's throat, and stabbed him multiple times while Kimmel held his legs. Murphy then stabbed Halverstadt. Kimmel and Murphy carried White from the bathroom into the bedroom and Murphy stabbed her in the chest and throat. Murphy and Kimmel took several items from White's apartment including, inter alia, a stereo, a VCR, White's purse, Roe's wallet, a wooden jewelry box, a silver letter opener, and a collection of CDs. They later sold much of the stolen property, and used White's credit card at gasoline stations and a hotel. All three victims died as a result of the injuries they sustained that night.

On May 18, 1999, Kimmel was arrested on a parole revocation warrant. Following his arrest, he gave a written statement to the police in which he denied any personal involvement in the murders. But two days later, after Murphy gave police an inculpatory statement, Kimmel gave a second written

statement in which he admitted to participating in the murders. On August 11, 1999, a grand jury indicted Kimmel on six counts of capital murder. More specifically, counts one, two, and three of the indictment charged Kimmel with having intentionally killed Rachel White, Susan Halverstadt, and Brett Roe by stabbing and cutting each of them with a knife while in the course of robbing each of these victims. Counts four, five, and six charged Kimmel with having intentionally killed White, Halverstadt, and Roe by cutting and stabbing each of them with a knife all in the same criminal transaction.

On February 14, 2000, Kimmel pleaded guilty. The punishment phase of the trial began on the same day. On February 18, 2000, the jury returned its verdict, finding separately with regard to each murder victim that (1) Kimmel posed a future danger; (2) he actually caused the death of the decedent or intended to kill the deceased, or anticipated that a human life would be taken; and (3) there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence. Accordingly, Kimmel was sentenced to death.

The Texas Court of Criminal Appeals affirmed Kimmel's conviction and sentenced him on November 7, 2001. *Kimmel v. State*, No. 73,786 (Tex. Crim. App. Nov. 7, 2001). Kimmel did not petition the Supreme Court for a writ of certiorari. On November 15, 2001, Kimmel filed a state habeas petition. The Texas Court of Criminal Appeals denied relief, adopting the trial court's findings of fact and conclusions of law on October 15, 2002. *Ex parte Kimmel*, No. 57,028-01 (Tex. Crim. App. Oct. 15, 2003).

On September 15, 2004, Kimmel filed the instant federal habeas petition urging six grounds for relief. The district court denied relief on all six grounds and denied Kimmel's request for a COA. On appeal, Kimmel requests a COA from this court on four issues.

3

## II. STANDARD OF REVIEW

Under Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner must obtain a COA before he can appeal the district court's denial of habeas relief. *See* 28 U.S.C. § 2253(c); *see also Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Hall v. Cain*, 216 F.3d 518, 521 (5th Cir. 2000) (citing *Slack v. McDaniel*, 529 U.S. 473 (2000). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Moreover, "'any doubts as to whether a COA should issue must be resolved in [petitioner's] favor.'" *Hughes v. Dretke*, 412 F.3d 582, 588 (5th Cir. 2005), *cert. denied*, 126 S.Ct. 1347 (2006) (alteration in original) (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)). Accordingly, "[w]e look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Id.*

4

III. DISCUSSION

Kimmel seeks a COA on the following claims: (1) his Sixth and Fourteenth Amendment right to have a fair cross section of the community on panels from which grand juries are chosen was violated; (2) his confession was obtained in violation of the Fifth, Sixth, and Fourteenth Amendments; (3) his due process rights were violated when the State suppressed exculpatory and impeachment evidence; and (4) his due process rights were violated when the State knowingly presented perjured testimony.

A.

The district court concluded that the first two claims were procedurally defaulted. On habeas review, a federal court may not review a claim for the denial of a federal right if the last state court to consider the claim expressly based its denial of relief on an independent and adequate state law ground. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001). "To satisfy the 'independent' and 'adequate' requirements, the dismissal must 'clearly and expressly' indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims." *Id.* This bar applies equally to substantive and procedural grounds. *Id.* "A procedural default will be excused . . . if 'the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law' or if the default would work 'a fundamental miscarriage of justice.'" *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

1.

Kimmel asserts that his Sixth and Fourteenth Amendment right to have a fair cross section of the community on panels from which grand juries are chosen was violated because Hispanics were

disproportionately excluded from the pool of eligible persons to serve on grand juries in Bexar County, Texas. He asserts that Hispanics were systematically underrepresented on grand juries in Bexar County from 1990 through 2000. The district court concluded that this claim was procedurally defaulted for two reasons: first, Kimmel failed to raise a challenge to the composition of the grand jury through a timely pretrial motion to quash the indictment, and second, Kimmel failed to raise this claim on direct appeal.

Kimmel has not argued, much less demonstrated, cause for the default or prejudice. Further, Kimmel failed to raise this issue on direct appeal. *Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir. 2000). Accordingly, Kimmel failed to show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Hall*, 216 F.3d at 521. Further, under Texas law, "a defendant must raise a challenge to the composition of the grand jury at the earliest point possible." *Ratcliff v. Estelle*, 597 F.2d 474, 476 (5th Cir. 1979). There is no dispute that Kimmel failed to raise the claim by a pre-trial motion to quash. Reasonable jurists would not debate the district court's conclusion that this claim is procedurally defaulted; therefore, Kimmel is not entitled to a COA on this issue. *Neville v. Dretke*, 423 F.3d 474, 478 (5th Cir. 2005).

2.

Kimmel also argues that his confession was involuntary because he was under the influence of a drug prescribed at the jail, and thus, the confession was obtained in violation of the Fifth, Sixth, and Fourteenth Amendments. Kimmel explains that, before his arrest, a crisis center prescribed Prozac for his suicidal thoughts; accordingly, he began taking Prozac on May 6, 1999, and continued taking it until his arrest on May 18, 1999. After his arrest, the jail personnel began treating him for depression with doxepin hydrochloride. He contends that the combination of the two medications

6

prevented him from being able to knowingly and intelligently waive his rights before giving the May 20, 1999, statement. Therefore, he contends that the police did not obtain a valid waiver of his rights before eliciting the incriminating statements and the use of this involuntary confession at his trial violated his due process rights.

The district court concluded that Kimmel procedurally defaulted this claim by failing to make a timely objection to the admission of his second confession on the ground that he was intoxicated. In Texas, "[i]n order to complain on appeal about the admissibility of a confession there must have been an objection thereon in the trial court, and the objection must have called the attention of the trial court to the particular complaint raised on appeal." *Little v. State*, 758 S.W.2d 551, 564 (Tex. Crim. App. Mar. 23, 1988). The state habeas court concluded that this claim was not preserved for review because Kimmel failed to raise it at his suppression hearing or before the trial court. Kimmel also failed to raise this claim on direct appeal. Kimmel does not dispute this finding nor does he attempt to show cause and prejudice for the default. Accordingly, reasonable jurists would not debate whether Kimmel states a valid claim of the denial of a constitutional right, nor would reasonable jurists debate the district court's conclusion that the claim is procedurally defaulted. *Hall*, 216 F.3d at 521. For these reasons, Kimmel is not entitled to a COA. *Hughes*, 412 F.3d at 597.

B.

Kimmel's third and fourth claims relate to notes taken by the State's prosecutor, Juanita Vasquez-Gardner, during conversations she had with two experts regarding the significance of Kimmel's tattoos. The tattoos include an "A" with a circle around it above the word "Chaos" on Kimmel's shoulder; the word "White" on one of his forearms; and the word "Pride" on the other forearm. Kimmel argues that (1) the prosecution failed to inform the court or defense counsel that

7

the experts did not know the meaning of the tattoos and (2) the prosecution suggested to a defense witness that the tattoos signified something other than what the experts had suggested.

As part of her investigation into the meaning of the tattoos, Vasquez-Gardner interviewed Royce Smithey and Bill Cheatham, Department of Corrections experts on prison gangs. Smithey told Vasquez-Gardner that the A with a circle around it could refer to the Aryan Brotherhood/Nation, but he was just guessing; and Cheatham indicated that the tattoo may very possibly be an Aryan Circle, but there was no indication that Kimmel had ever been suspected or monitored as being a part of the Aryan gang. Vasquez-Gardner's notes also indicate that Smithey stated the words "white pride" may or may not mean anything, and may or may not signify gang membership. Vasquez-Gardner also consulted Rocky Dyer of the San Antonio Police Department. Dyer was unable to explain how the tattoos related specifically to Kimmel, but did provide general information as to what the symbols might mean, including that the circled A could symbolize anarchy. Vasquez-Gardner continued to investigate the meaning of the tattoos on the internet and came to believe, based on her conversation with Dyer and articles she found on the internet, that the symbol represented anarchy.

During the punishment phase of trial, the defense called Dr. Edward Gripon, a psychiatrist, who opined that it was unlikely that Kimmel would commit criminal acts of violence that would constitute a continuing threat to society. On cross-examination, the prosecutor questioned Dr. Gripon regarding Kimmel's tattoos. Specifically, the prosecutor questioned the doctor regarding whether the circled A tattoo signified anarchy. Outside the presence of the jury, the prosecutor asked Dr. Gripon whether Kimmel had informed Dr. Gripon that the symbol signified anarchy or whether Dr. Gripon knew of that meaning; Dr. Gripon answered "No."

8

In the presence of the jury, she asked Dr. Gripon whether Kimmel had tattoos that indicated anarchy and Dr. Gripon answered "Yes. That's what I think is supposed to be the meaning of them, yes." The prosecutor also referenced an incident during which Kimmel referred to a prison guard by a racial epithet and then questioned the doctor regarding Kimmel's "white pride" tattoos. She asked whether the anarchist tattoos could be interpreted to mean that someone does not want to abide by the laws and rules of society. Dr. Gripon responded that this was a possible interpretation, but that one must be careful in interpreting tattoos because they are often an expression of extremism, not necessarily a clear indicator of what a person believes.

1.

Kimmel argues that the prosecution failed to disclose material evidence favorable to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, he argues that the prosecution failed to inform the defense or the court that the State's experts expressed doubts about the meaning of the tattoos or that they suggested a different meaning.

To establish a *Brady* violation, Kimmel must prove that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant because it was either exculpatory or impeaching; and (3) the evidence was material." *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006). "'Evidence is 'material' if there is a reasonable probability that, had the evidence been disclosed, the result at the trial would have been different; a reasonable probability is one that undermines confidence in the outcome of the trial.'" *Summers v. Dretke*, 431 F.3d 861, 878 (5th Cir. 2005), *cert. denied*, 126 S.Ct. 2948 (2006) (quoting *Duncan v. Cain*, 278 F.3d 537, 539-40 (5th Cir. 2002)).

"There is no duty to furnish a defendant with exculpatory evidence that is fully available to the defendant though the exercise of reasonable diligence." *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th

9

Cir. 1998). As the State argues, Kimmel was in the best position to know the significance of his own tattoos. Moreover, nothing prevented Kimmel's counsel from conducting research regarding the significance of the tattoos. "Although exculpatory and impeachment evidence fall within the purview of *Brady*, neutral evidence does not." *United States v. Dillman*, 15 F.3d 384, 390 (5th Cir. 1994). Neither officer offered a conclusive opinion as to the significance of the tattoos, and Kimmel has not shown how this information would have impeached Dr. Gripon's testimony. *Cf. Id.* ("[The witness]'s statement-to the effect that she did not remember the meeting-is neutral, not exculpatory or impeaching in nature."). Moreover, Kimmel has not shown that the evidence was material, i.e., that there is a reasonable probability that the result of the punishment phase of trial would have been different. *Miller v. Dretke*, 404 F.3d 908, 916 (5th Cir. 2005) ("[F]or *Brady* purposes, evidence is material if there is a *reasonable probability* that, had the evidence been disclosed, the result would have been different."). Further, defense counsel was aware that Dr. Gripon had previously indicated that he was unaware of the tattoo's meaning; accordingly, on redirect, defense counsel could have addressed Dr. Gripon's knowledge of the tattoo, or lack thereof, and impeached or clarified his testimony without the aid of the officers' statements. Reasonable jurists would not debate the district court's rejection of this claim; accordingly, Kimmel is not entitled to a COA.

2.

Kimmel also argues that the prosecutor knowingly used false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), by "duping" Dr. Gripon into agreeing that the tattoos signified anarchy, and failing to alert the trial judge that this testimony was false. Kimmel contends that the prosecutor failed to inform the court that she was guessing about the tattoo signifying anarchy or that the experts had suggested a different meaning. He argues that, outside the presence of the jury, Dr. Gripon indicated that he did not know the significance of the tattoos; however, in front of the jury,

the witness was duped into agreeing with the prosecutor that the tattoos signified anarchy because the prosecution previously suggested this meaning.

"In order to establish a *Napue* violation, the defendant must show (1) the statements in question are actually false; (2) the prosecution knew that the statements were false; and (3) the statements were material." *United States v. Haese*, 162 F.3d 359, 365 (5th Cir. 1998). Kimmel has neither argued nor demonstrated that Dr. Gripon's testimony was in fact false; instead, he contends that the prosecutor failed to inform the court that two of her experts did not know what the tattoos signified or that she was guessing. This does not show that the testimony is false, but rather that others did not know the meaning of the tattoos. *Cf. United States v. Wall*, 389 F.3d 457, 473 (5th Cir. 2004), *cert. denied*, 544 U.S. 978 (2005) ("Wall has not established that McDowell's testimony was actually false. He has merely shown that Ristau's testimony would establish a conflict in the testimony, a far cry from showing that it was 'actually false.'"). As noted above, defense counsel could have questioned Dr. Gripon on the accuracy of his testimony regarding the meaning of the tattoos on redirect, but chose to not use this opportunity. Because Kimmel has not demonstrated that the testimony was in fact false, the district court's conclusion that he was not entitled to relief on this claim is not debatable among reasonable jurists; consequently, Kimmel is not entitled to a COA.

## IV. CONCLUSION

Kimmel has failed to show that jurists of reason could debate the district court's resolution of his habeas petition. Accordingly, his application for a COA is DENIED.

11