**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 94-50646**
_____

United States of America,

Plaintiffs-Appellee,

versus

Billie Mac Jobe, Stephen Taylor, Philip Mark Sutton, Stanley
Pruet Jobe, and Fernando Novoa,

Defendants-Appellants.

_____

**Appeals from the United States District Court**
**for the Western District of Texas**
_____

March 8, 1996

Before JONES, STEWART, and PARKER,[*] Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants Billie Mac Jobe ("Billie Mac"), Stanley Pruet
Jobe ("Stanley"), Stephen Taylor, Philip Mark Sutton and Fernando
Novoa were convicted by a jury of various offenses undertaken to
organize, conduct, and maintain an elaborate and expanded check-
kiting scheme through El Paso banks for over a year and a half. On
appeal, they pose numerous challenges to their convictions and
sentences. After carefully considering these challenges and the
underlying record, this court AFFIRMS the conviction as charged in

[*] After oral argument, Judge Parker recused himself from
any further participation in this matter. This opinion reflects
only that of Judges Jones and Stewart.

Count 2 for all of the appellants, VACATES Stanley's managerial or supervisory sentencing enhancement, and REMANDS Stanley's case for resentencing.

## FACTUAL BACKGROUND[1]

The appellants were indicted for bank fraud, in violation of 18 U.S.C. § 1344 and 2, and for conspiracy to commit bank fraud, to make false entries in bank records, and to obtain loans via false statements in loan applications, contravening 18 U.S.C. § 371. In addition, the indictment charged that some or all of the appellants had made false statements on loan applications,[2] false bank entries, reports, and transactions,[3] laundered funds,[4] or aided and abetted such activities.[5] The indictment requested a criminal forfeiture of property.[6]

The district court bifurcated the criminal trial and the request for criminal forfeiture. After nearly two weeks of trial on the criminal charges, the jury returned the following verdicts: all defendants were convicted of conspiracy to commit bank fraud ("Count 1"); Billie Mac was convicted of bank fraud, while Stanley,

---

[1] Our review of the record was much more difficult because the parties frequently either furnished incorrect record citations or no citation at all.

[2] 18 U.S.C. § 1014.

[3] 18 U.S.C. § 1005.

[4] 18 U.S.C. § 1956(a)(1)(A)(I).

[5] 18 U.S.C. § 2.

[6] *See* 18 U.S.C. §§ 1982(a)(1)-(a)(2)(A), 982(b)(1)(A)-(B).

Taylor, Sutton, and Novoa were convicted of aiding and abetting this bank fraud ("Count 2"); Taylor and Sutton were convicted of making false bank entries in violation of 18 U.S.C. §§ 1005 and 2 (collectively, Counts 4, 6, and 16); and Stanley was convicted both of aiding and abetting Sutton to make a false bank entry (Count 6) and of making false statements on a bank loan application (Count 5).[7]

Although each appellant was convicted by the jury of various offenses undertaken to organize, conduct, and maintain an elaborate check kiting scheme, at the sentencing hearing, the district court found no evidence of monetary loss to any of the financial institutions involved. In part for this reason, the appellants received light concurrent sentences: Billie Mac was sentenced to eighteen months incarceration and fined $30,000; Stanley received five months incarceration, five months of community confinement in a residential facility or half-way house, and a $15,000 fine; Taylor, ten months incarceration; Sutton, ten months incarceration; and Novoa, five months incarceration and five months of community confinement in a residential facility or half-way house; the appellants were also ordered to serve three-year terms of supervised release.

A discussion of some of the voluminous evidence concerning the appellants' relationships to the involved financial

---

[7] The district court, after a separate forfeiture proceeding, entered a judgment of acquittal on those allegations.

institutions and the crucial transactions involved in the prosecution is necessary to understand this opinion's analysis.

Billie Mac was a 1/3 owner, officer and director of Jobe Concrete Products, Inc., in El Paso, Texas. He also owned the Jobe Bar Track Ranch and was a part owner, officer and director of Cal-Tex Spice Co. He and his son, Stanley, owned a 40% share of First Park National Bank ("FPNB") of Livingston, Montana, a federally insured financial institution. Billie Mac maintained checking accounts at FPNB as well as at El Paso State Bank ("EPSB"), a federally insured, state chartered bank in El Paso; Jobe Concrete Products and Cal-Tex Spice had checking accounts at EPSB. Billie Mac was a shareholder of EPSB.

Stanley, Billie Mac's son, was president and a 1/3 owner of Jobe Concrete Products, Inc., a partial owner and director of Cal-Tex Spice Co. and a shareholder and director of EPSB. At FPNB in Montana, Stanley maintained a checking account and sat on the board of directors.

The remaining appellants are employees of some of the financial institutions involved. Taylor was the president of EPSB. Novoa, as a cashier and officer of EPSB, approved significant wire transfer transactions involving Billie Mac. After leaving his employment with EPSB, Novoa became president of Cal-Tex Spice and performed various financial and administrative work for Jobe Concrete Products. Sutton was the president of another federally insured bank used in the kite, Continental National Bank ("CNB").

**4**

The scope of the expanded check kite was uncovered essentially by FBI special agent Randy Wolverton ("Wolverton"), whose analysis of the activity in several Jobe checking accounts from December of 1989 through July of 1991, revealed that a large kite was underway involving Billie Mac and Stanley and their checking accounts at CNB, TCB, FNPB, and EPSB.

In order to manipulate and maximize the float, or lag time between transactions in the banking system, Billie Mac and his cohorts inflated his account balances artificially by making countless wire transfers based on uncollected funds, by writing checks against uncollected or nonexistent funds, and by consummating fraudulent loans that were camouflaged by false entries or statements in bank records. As a result of these machinations, very large checks were routinely paid in full despite the actual insufficiency of funds to cover them. Billie Mac's check kite was remarkably efficient; unlike the vast majority of check kites, this one not only stayed constantly ahead of the lag but never did self-destruct. Evidence at trial demonstrated that none of the checks written by Billie Mac was ever dishonored or returned for insufficient funds, and all of the loans used to commence the kiting scheme were paid in full and with interest to the lenders.

Further evidence of the "success" of the check-kiting is revealed by the vast sums of money floated. Wolverton testified that bank records for December 1, 1989 through March 12, 1990, created the impression that $150,000,000 had been deposited into

**5**

the Jobe accounts, although less than 15% of that figure, or approximately $20,000,000, was actually present in these accounts. Similarly, from April through June of 1991, Wolverton explained that although bank records indicated that $58,000,000 was deposited into these accounts, "77% of those, or about $44,000,000 worth of those deposits, were nothing more than checks and wire transfers being exchanged with each other through these accounts, thereby artificially inflating the accounts." Only $13,000,000 was actually deposited into the accounts.

Profits from the scheme were used to finance business ventures for Billie Mac and Stanley. For example, in late 1989, Jobe Concrete Products purchased a spice plant from the Baltimore Spice Co. for nearly $3,500,000 and Cal-Tex Spice Co. Austin Hale ("Hale"), the credit manager and eventually vice-president of Jobe Concrete Products, testified that neither Jobe Concrete Products nor Billie Mac had enough liquidity to fund these purchases. Hale further testified that Stanley concurred and expressed his concern to Hale that the company needed cash not only to finance its investment and business activities, but also so that his father, who was "overly stressed about the situation", would not need to work as hard.

Billie Mac commenced the kite by opening a checking account for the Jobe Bar Track Ranch at CNB. Before it was officially opened, Billie Mac wrote himself a check from the new account or starter booklet for $990,000, endorsed this check, and deposited it at EPSB. The opening balance of the CNB checking

6

account was, however, only $1,000. Sutton was the account officer at CNB supervising the Jobe Bar Track Ranch checking account.

After the CNB check was deposited at EPSB, EPSB issued a cashier's check for $3,536,347 to Billie Mac signed by Taylor, the bank president. Although standard banking practice would require EPSB to post an entry in its books or records indicating that the cashier's check had been issued, no such entry was made in EPSB records that day; in fact, no entry was made into EPSB records until several days later on January 4, 1990. Nearly a week earlier, on the same afternoon that he obtained the EPSB check, Billie Mac used this cashier's check to purchase the spice plant.

When the original $990,000 CNB check was presented for payment at that bank, Martha Karlsruher ("Karlsruher"), a senior vice president and bank cashier, noticed that this large check had been written on the Jobe Bar Track Ranch account before it had opened and that the balance in the account was merely $1,000. She immediately advised Sutton of her findings, but he authorized forced payment of the check nonetheless, explaining that a pending loan from CNB to Billie Mac would provide the necessary funds.

As Sutton had explained, CNB did lend Billie Mac $925,000, its legal lending limit, on January 8, 1990 and back-dated this loan to January 5. The loan's stated purpose was to "[r]eplenish personal liquidity utilized in the purchase of Baltimore Spice of Texas." However, the loan did not replenish Billie Mac's personal liquidity, but was rather deposited directly into the Jobe Bar Track Ranch checking account, so that the

**7**

$990,000 check that had been presented for payment could clear. Karlsruher further explained that because the bank's management and loan committee were "in a hurry to fund the loan [and] disburse the monies to the customer," they did not review Billie Mac's loan application before approving it.

This type of suspicious activity continued in the Jobe Bar Track Ranch account and in other accounts including the Jobe Concrete Products checking account at Texas Commerce Bank ("TCB"). In February or March of 1990, Hale, Jobe Concrete's credit manager, learned that Billie Mac was signing checks on the Jobe Concrete Products account but failing to list either a payee or amount on the company's check log. Hale began to be "suspicious of a check kite." As these suspicions grew, he "started looking for another job" and eventually quit in November of 1991.

The check kiting activity also became more obvious to employees in the banks used in the kite. For instance, from January through July of 1990, Karlsruher, who had already noticed unusual activity in the Jobe Bar Track Ranch account at CNB and had discussed this with Sutton, warned Sutton repeatedly that she suspected kiting by Billie Mac and that any further loans to him would exceed CNB's legal limit. Sutton assured her that "it was a normal business practice for certain companies to operate this way," but Karlsruher disagreed and had not observed such practice in her experience as a banker.

Sutton's actions began to breach standard banking practice or policy. He occasionally extended CNB's closing

**8**

deadline in order to give Billie Mac sufficient time to deposit or wire funds to cover overdrafts.[8] Karlsruher testified that Billie Mac was virtually the only customer who received such specialized treatment.[9] Further, despite express warnings from Karlsruher that kiting was going on and that a criminal referral should be filed regarding Billie Mac's activities, Sutton continued to approve forced payment of countless checks written by Billie Mac far in excess of the balance in the Jobe Bar Track Ranch account at CNB. Although Karlsruher could have filed a criminal referral regarding the activity, she explained that she did not do so because she was "provided a copy of a board resolution that ordered management not to file this referral."

Others associated and employed by CNB, who could not help but notice that Sutton was approving numerous forced payments on checks written by Billie Mac, came to share Karlsruher's concerns about the check kite. Patrick Kennedy ("Kennedy"), CNB's attorney, reviewed some of Billie Mac's activities in the Jobe Bar Track Ranch account and suggested that CNB file a criminal referral. Although Kennedy repeatedly attempted to discuss this suggestion with Sutton and to obtain additional information from him, Sutton was unresponsive. Patricia McLean ("McLean"), CNB's loan review

---

[8] The closing deadline at CNB was normally 2:00 p.m.. If the bank could not settle its funds by that time, these funds were not available for overnight investment and the bank risked losing the corresponding overnight interest.

[9] As Karlsruher explained, "[t]he only [other customer] that comes to mind, but that was a few years later, that [sic] would have been El Paso Auction."

officer, not only suggested that a criminal referral be filed, but also expressed concerns to Sutton that if CNB continued to lend to Billie Mac or any affiliated entity, the bank might exceed its legal lending limits. Yet again, these warnings went unheeded.

Indeed, loan activity at CNB involving the Jobes continued. On May 21, 1990, with Sutton acting as the bank's loan officer, CNB funded a $750,000 loan to Deer Creek Spice Co., guaranteed by Stanley. In a loan presentation form, an internal document prepared by bank employees, the purpose of the Deer Creek Spice loan was described as acquisition of inventory, and the loan principals were listed as Stanley and Frank Owen IV. Although the size of the Deer Creek Spice loan mandated review by CNB's management loan committee, no such review occurred.

On the very day that the Deer Creek Spice loan was authorized, Stanley endorsed the check for the proceeds and turned it over to Billie Mac who, in turn, deposited it into the cashier's checking account at EPSB. The proceeds of the Deer Creek Spice loan were used to pay for cashier's checks that Billie Mac had obtained from EPSB earlier in the day. These cashier's checks had been deposited at CNB to allow a $750,000 check written against the Jobe Bar Track Ranch account to clear; not surprisingly, the $750,000 check had been written by Billie Mac and was payable to him.

Eventually, Sutton, Karlsruher, and McLean were asked to meet with Kennedy, John Wright, the chairman of the board of CNB, and Jack Cardwell, a board member, to discuss Billie Mac's

relations with the bank.  After the meeting, Karlsruher testified that Sutton ordered her not to contact either bank directors or bank attorneys without his preclearance; he threatened to fire her or any other employee who filed a criminal referral on Billie Mac and promised her a promotion and raise for her cooperation.  Sutton stressed to her that a criminal referral on Billie Mac "would cause [the Jobes] serious financial harm and set-backs and that the other banks they were dealing with may call their loans . . . once an investigation ensued."  Finally, however, after a CNB board meeting in June of 1990, the Jobe Bar Track Ranch checking account was closed and Billie Mac paid CNB for his use of uncollected funds an amount equal to what the bank would have earned in an overnight investment of those funds at the federal funds rate.  Of course, as Karlsruher explained, the federal funds rate is lower than the commercial loan rate.

Undaunted, Billie Mac and his cohorts continued their expanded check kite even after the CNB account closed.  Loans from other banks were used to float the kite, and unconventional wire transfer procedures both inflated checking account balances artificially and concealed insufficient funds or overdrafts. Unlike checks, wire transfers experience no float or lag time. When a normal electronic wire transfer occurs, funds are simultaneously deducted from the transferring institution's account at the Federal Reserve and credited to the recipient's bank account.

But Billie Mac's multiple wire transfers were not conventional ones. Taylor, the president of EPSB, and Novoa, the bank's cashier and senior officer in charge of accounting and of the wire transfer room, authorized wire transfer personnel to credit Billie Mac's checks immediately and to make wire transfers for him without waiting for the necessary funds to be collected.[10] Diana Vincent, an internal auditor with EPSB, testified that the countless wire transfers completed for Billie Mac on uncollected funds violated standard EPSB policy that all wires be paid for with collected funds. Vincent also testified that had Billie Mac been forced to comply with bank policy and deposit sufficient funds before conducting a wire transfer, his insufficient accounts would have appeared on the bank's uncollected funds or overdraft reports. Billie Mac's accounts escaped these reports because Novoa was initialing most of Billie Mac's checks and approving them for immediate credit.[11] According to Laura Avila an employee in the EPSB wire transfer room, both Novoa and Taylor would initial the checks to authorize immediate credit.

Because of the specialized treatment that Billie Mac received from Taylor and Novoa at EPSB, he made the bank's wire transfer department a second home, visiting several times daily

---

[10] Although this practice is unconventional, the government concedes that it is not necessarily illegal. Banks enjoy some discretion to extend immediate or "next day" credit on uncollected funds.

[11] Although Vincent explained that, in most instances, Novoa's initials appeared on the checks, she admitted that occasionally other officers or authorized personnel would initial them.

from January through September of 1990 and sending hundreds of wire transfers during that time. At trial, the testimony of Avila and Maria Reyes Novoa's administrative assistant who supervised the wire transfer room, indicated that Billie Mac's transfers began at around $50,000 a day, but quickly grew to $500,000 and then to a combined daily total of $1,000,000.

These frantic and unconventional wire transfers led other employees at EPSB to suspect kiting. For instance, Reyes grew concerned about the fact that Billie Mac was allowed to conduct wire transfers when his accounts were insufficient to pay for these transfers. Reyes recounted that once, after she had verified that the account against which Billie Mac had intended to pay for the transfer had insufficient funds, she took the check to Novoa and, although she did not expressly inform him of the insufficiency, he ordered her to proceed with the wire transfer. As this transfer activity continued, Reyes eventually spoke with Taylor, but to no avail. She explained, "[s]ince I was concerned, I went and asked [Taylor], you know, if he was aware that the checks were, you know, going through. And he told me that he was going to check into it and that he would get back to me. But he never got back to me."

Yvonne Pearson, an employee in the proof department at EPSB, testified that since Billie Mac was allowed to conduct transfers on uncollected funds, proof department employees were allowed to override the proof machine's time consuming determination of the float for a check. To circumvent the proof machine, Billie Mac's checks were deposited using special deposit

**13**

slips initialed by bank officers to allow for next-day availability; most of these deposit slips were initialed by her boss, Novoa. Furthermore, when Billie Mac would present such a deposit slip, a special transaction code would be entered into the bank's records that would prevent the checks from appearing on the bank's uncollected funds report. Because of these suspicious activities and practices, Pearson concluded that she "knew" that Billie Mac was kiting checks.

Vincent, EPSB's internal auditor, warned Taylor in a memorandum that Billie Mac was kiting checks "to the tune of $790,000 to $1,760,000 a day, and this amount is steadily increasing," as well as conducting wire transfers on uncollected funds. Moreover, she explained that Taylor's and Novoa's decision to extend Billie Mac next day availability on checks made it difficult to ascertain the full extent of the ongoing kite. Taylor delayed responding to Vincent for nearly three weeks before asking her "to track the activity for a few days and report back to him."

Vincent did exactly that. After tracking Billie Mac's accounts for two days, she sent Taylor another memorandum detailing transactions in which Billie Mac was given more than $3,200,000 in immediate credit to pay for wire transfers from EPSB. After Taylor received this memo, Vincent testified that to her knowledge, Taylor did not take any remedial action and did not speak with her about either the memo or the activity which had been tracked.

Even Billie Mac's own employees began to question the deposit and wire transfer activity at EPSB. Hale, the vice

**14**

president of Jobe Concrete Products, testified that he had a conversation with Billie Mac regarding this activity. According to Hale, Billie Mac explained that Novoa had developed a system by which he could receive immediate credit for deposits merely by using special deposit slips.[12]  Eventually, Novoa resigned his position at EPSB and went to work for his esteemed customer, Billie Mac, as president of Cal-Tex Spice and at Jobe Concrete Products.

Upon Novoa's departure from EPSB, Barbara Baker ("Baker"), the acting cashier for the bank, learned about the practice of allowing Billie Mac to conduct wire transfers on uncollected funds.  She testified that this practice did not leave a good audit trail and impeded the bank's ability to analyze float and collectability of Billie Mac's checks.  Baker then sent Taylor a memo reiterating these conclusions and suggesting that funds be collected from Billie Mac before he be allowed to conduct a wire transfer.

After sending the memo to Taylor, Baker met with him. She testified that during this meeting, Taylor appeared shocked by the activity in Billie Mac's accounts; as Baker recalled, "[Taylor] had the memo in his hand and he just kind of shook his head a little bit and said, 'Billie Mac is kiting.  How long did he think he could get away with this?'" Taylor then gathered the copies of Baker's memo and "threw them in the trash and he said he wanted all the copies out of circulation.  He didn't want any copies of the

_____

[12]    On appeal, Novoa objects to this portion of Hale's testimony under *Bruton v. United States,* 391 U.S. 123, 88 S. Ct. 1620 (1968).  The objection will be discussed *infra.*

**15**

memo in the bank." However, even after receiving memoranda from both Baker and Vincent, Taylor still approved wire transfers for Billie Mac on uncollected funds.

Perhaps exhausted by his daily trips to the wire room at EPSB, Billie Mac began wiring funds from CNB where he no longer had an account. Much as Taylor and Novoa had ordered at EPSB, Sutton authorized Billie Mac to conduct wire transfers on uncollected funds, even though no other customer was regularly extended such a privilege. However, these transactions, unlike the transfers at EPSB, were appearing regularly on the bank's "deficit available balance report" as suffering from a large, uncollected balance. Sutton approached Karlsruher with a proposal to give Billie Mac's checks a special transaction code which would camouflage them from the bank's reporting system. She refused to participate in such a scheme.

The very day that bank examiners arrived at CNB to analyze the transfer activity, Billie Mac stopped making wire transfers from that bank. As the bank examiners analyzed accounts at CNB and at EPSB, they began to discover the vast extent of Billie Mac's kiting scheme. For instance, while EPSB was lending Billie Mac and Stanley over $1,000,000 each year, the bank's average collected balances were negative.

While the bank examiners continued to investigate, Taylor spoke to Tom Burress ("Burress"), one of the examiners analyzing loans and accounts at EPSB. Taylor wanted to explain the cashier's check for over $3,500,000 that Billie Mac had been given on

**16**

December 29, 1989, without any confirmation that he had sufficient funds to pay for it. Taylor told Burress "[t]hat Fernando Novoa presented the check for him to sign. Taylor signed the check without verifying that there [sic] collected funds in the account sufficient to pay for the check. His stated reason was that he had faith in the cashier that that [sic] was okay." Taylor also told Burress that he believed that Novoa had held some checks written by Billie Mac in his desk until January 4, 1990, the date on which the cashier's check was actually purchased. The next day, however, Taylor changed his story, suggesting that "he was wrong in accusing [Novoa] of holding the checks in his drawer. And prior to this occurrence, he had no reason to fault [Novoa's] work."[13]

As the involvement of bank examiners and federal agents intensified, Billie Mac's expanded check kite came to a crashing halt. At trial, there was substantial disagreement over the loss, if any, that the banks involved in this kite had suffered. All of the loans and checks had been paid and honored. From this fact, Rene Pena ("Pena"), a certified public accountant who testified as a defense expert, concluded that the banks had suffered no loss. Although Pena recognized that the various Jobe accounts were frequently in overdraft, he noted that this overdraft was usually corrected quickly. According to Pena, Billie Mac was merely "actively utilizing the loans in a constant cash management . . . of running the [Jobe] entities as a whole."

---

[13] Novoa challenges the admission of Taylor's statements through Burress under *Bruton.* This issue will be discussed *infra.*

DISCUSSION

## I. Appellants' Common Challenges to their Convictions

### A. Juror Misconduct

Billie Mac, Stanley, Sutton, and Novoa appeal the district court's denial of an evidentiary hearing to investigate allegations of juror misconduct and its denial of their motions for a new trial based partially on this alleged misconduct.

Appellants complain that during the trial, John A. Shamaley ("Shamaley"), one of the jurors, was told by a relative that Billie Mac had "previously been convicted in another bank fraud case." In an affidavit submitted to the district court, Shamaley explained that at some time during the trial, he told David Carnes a relative, that Carnes's employer, Jack Cardwell had been mentioned during the trial; Cardwell was a member of the board of directors of CNB. Carnes told Shamaley that Billie Mac had previously been convicted of bank fraud and suggested to Shamaley that because of this prior conviction, "he would not be at all surprised to find that something improper was going on here." However, Shamaley acknowledged in his affidavit that

> [t]here was *no evidence presented at the trial that Billie Mac Jobe had any previous arrests or convictions. I did not relay this information to any of the other jurors* on this case, but I was aware after the conversation with David Carnes that Mr. Jobe had previously been convicted of the same offense that he was charged with in this case.[14]

---

[14] In fact, the information that Carnes relayed to Shamaley was technically incorrect. In 1979, Billie Mac had pleaded guilty to one count of mail fraud. At a pretrial hearing, the district court indicated that this prior conviction

(emphasis added).

This court reviews the district court's denial of a motion for new trial for abuse of discretion. *United States v. Sanchez-Sotelo,* 8 F.3d 202, 212 (5th Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1410 (1994). Likewise, "[t]he procedures used to investigate allegations of juror misconduct and the decision as to whether to hold an evidentiary hearing are matters which rest solely within the sound discretion of the district court." *United States v. Roberts,* 913 F.2d 211, 216 (5th Cir. 1990), *cert. denied sub nom., Preston v. United States,* 500 U.S. 955, 111 S. Ct. 2264 (1991).

Recently, this court reiterated the principle that in any trial there is an initial presumption of jury impartiality. *United States v. Ruggiero,* 56 F.3d 647, 652 (5th Cir. 1995), *cert. denied,* ___ U.S. ___, ___ S. Ct. ___ (1995). This presumption may be defeated, however, through evidence that the extrinsic factual matter actually tainted the jury's deliberations. *Id.* (*citing United States v. O'Keefe,* 722 F.2d 1175, 1179 (5th Cir. 1983)). A district court must investigate the asserted impropriety only when a colorable showing of extrinsic influence is made. *Id.*

*Ruggiero* not only examined when a district court must investigate alleged juror misconduct, but also explained

> . . . that a defendant is entitled to a new
> trial when extrinsic evidence is introduced
> into the jury room unless there is no
> reasonable possibility that the jury's verdict

---

would be admissible at trial for impeachment purposes only if
Billie Mac testified; he did not.

**19**

was influenced by the material that improperly
came before it.

*Id.* (citations omitted). Hence, when extrinsic evidence is introduced into the jury room, the defendant enjoys a rebuttable presumption of prejudice and "the government has the burden of proving the harmlessness of the breach." *Id.* (citations omitted). When the district court considers whether the government has carried this burden, it should examine "the content of the extrinsic material, the manner in which it came to the jury's attention, and the weight of the evidence against the defendant." *Id.* at 652-53 (citations omitted).

In the instant case, the district court investigated the alleged impropriety when it considered Shamaley's affidavit. Through this affidavit and through the evidence at trial, the court was able to conduct the inquiry mandated in *Ruggiero*. Having done so, the court concluded that there was no reasonable possibility that the extrinsic information had prejudiced the appellants. When discussing Billie Mac, the court reasoned that

> The circumstances fail to indicate that Defendant Billie Mac Jobe was prejudiced by the incident. Juror Shamaley obviously attributed no significance to the incident, because he did not report it to the Court or to any other juror. Furthermore, the record shows that Billie Mac Jobe was named as a defendant in six counts that were submitted to the jury for a verdict, and the jury found Jobe not guilty as to four of those counts . . . . Under the facts of this case, the Court is unable to find a reasonable possibility that the extrinsic information communicated to one juror prejudiced the Defendant.

Because the information relayed to Shamaley did not taint his deliberations, the information was not relayed to any other jurors, and the evidence against Billie Mac on the counts of conviction was overwhelming, the district court did not abuse its discretion when it denied the appellants' request for a new trial without first ordering an evidentiary hearing.[15] It is unnecessary to apply the Ruggiero factors separately to each of the other defendants, as there is no likelihood that they were prejudiced in any way by the tainted report of Billie Mac's prior criminal conduct.

## B.    Jury Instructions

All of the appellants contend that the district court erroneously declined to submit their requested instruction on good faith to the jury.  Furthermore, the appellants argue that the instruction given to the jury somehow shifted the burden of proof from the government to the appellants when it failed to inform jurors that the government carried the burden of negating their

---

[15]    Additionally, as *Ruggiero* explains, a court is limited in its ability to inquire into jury deliberations.  Federal Rule of Evidence 606(b) forbids a juror from testifying about deliberations, and this rule also bars juror testimony regarding

> at least four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.

*Ruggiero,* 56 F.3d at 652.  Given these limitations, an evidentiary hearing would have provided the district court with virtually nothing but what was already contained in the Shamaley affidavit.

21

claims of good faith. The appellants also suggest that the district court erroneously limited their defense of good faith by failing to extend this defense to the false entry offenses.

Billie Mac urges similar error with respect to his requested instructions on willfulness and specific intent. He notes that the district court did not explicitly define either term and suggests that the court's omission seriously impeded his ability to present his defense to the jury.

Recognizing that district courts enjoy substantial latitude in formulating jury instructions, this court reviews the refusal to provide a requested jury instruction for abuse of discretion. *United States v. Smithson,* 49 F.3d 138, 142 (5th Cir. 1995). The district court will not abuse its discretion when it denies a proffered instruction unless this instruction "(1) was a correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense." *Id.*

In this case, the district court did instruct the jurors on good faith. The instruction explained that

> [i]n determining whether or not any defendant acted with criminal intent to defraud or deceive, you may consider whether or not that defendant had a good faith belief that what he was doing was legal. If you have a reasonable doubt as to whether or not a defendant had a good faith belief that was [sic] he was doing was legal, you must acquit that defendant or defendants and say by your verdict 'not guilty.'

**22**

The appellants' challenges to this instruction are meritless. This instruction in no way reduces the government's burden of proof beyond a reasonable doubt or thrusts a burden on the appellants. Moreover, the court did not limit its good faith instruction to certain appellants or defenses; rather, the instruction provides that the good faith of *any* appellant may be considered when adjudicating his criminal intent on any charged offense.

Although Billie Mac contends that the district court erred when it refused separately to define either willfulness[16] or specific intent, the court clearly defined "knowingly." Indeed, its definition of this term came from this circuit's pattern jury instructions and provided that "[t]he word 'knowingly' as that term is used in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident." Though the district court did not explicitly define specific intent, it correctly charged the jurors on the element of intent in each offense. Both of Billie Mac's proposed instructions on specific intent merely reiterate that the government must prove beyond a reasonable doubt "that the defendants *knowingly* did an act which the law forbids . . . ." (emphasis added). The effect of the proposed instructions is redundant, and they were unnecessary.

---

[16] In its conspiracy instructions, the court instructed the jury that they must conclude beyond reasonable doubt "[t]hat the defendant knew the unlawful purpose of the agreement and joined in it *willfully, that is with the intent to further the unlawful purpose.*" Hence, while the instructions may have not separately defined willfulness, when read as a whole, they did include such a definition.

In sum, the court's instructions accurately reflected the law and substantially covered the appellants' proffered instructions without impairing the ability of any of the appellants to advance a defense.

### C.    Joint Motion for Severance

Stanley, Taylor, Sutton, and Novoa contend that the district court abused its discretion when it denied their joint motion for severance.  The joint motion was premised on the belief that at a separate trial, Billie Mac would provide exculpatory testimony for the appellants.  To support this belief, the appellants submitted *in camera* Billie Mac's affidavit, which stated that he would testify at a separate trial in which he was not a co-defendant.  The affidavit also asserted that Billie Mac would testify that, to his knowledge, none of the other appellants had committed any of the charged offenses.

The district court denied the joint motion for severance after conducting a hearing.  The court reasoned that Billie Mac's affidavit "falls far short of demonstrating a basis for severance".  As the court put it, Billie Mac insisted in his affidavit

> that he acted in good faith in connection with all the financial transactions involved in the indictment, and that he committed no offense. The remainder of his affidavit consists of conclusory statements that his co-Defendants did not conspire with him to commit any offense and that they are innocent of any wrongdoing . . . If he gave the testimony at a severed trial, it would have little evidentiary value.

To allege a prima facie case for severance based on the exculpatory testimony of a co-defendant, a defendant must first show, among

**24**

other things, that the testimony is truly exculpatory in nature and effect. *United States v. Rocha,* 916 F.2d 219, 232 (5th Cir. 1990), *cert. denied,* 500 U.S. 934, 111 S. Ct. 2057 (1991) (laying out detailed criteria for severance based on 26 codefendant testimony). Billie Mac's affidavit did not fulfill that standard.

The appellants rely on this court's decision in *United States v. Neal,* 27 F.3d 1035 (5th Cir. 1994), cert. denied, ___ U.S. ___, 115 S. Ct. 1165 (1995), to support their claim that severance was improperly denied. In *Neal,* this court held that the district court erred when it denied severance in a drug conspiracy case in which the "undisputed leader of the conspiracy" gave extensive, specific, and exculpatory testimony both by affidavit and *in camera* and would have so testified in a separate trial on behalf of the co-defendants. *Id.* at 1047 & 1047 n.21. Recognizing that "a defendant might suffer prejudice [from a joint trial] if *essential exculpatory evidence* that would be available to a defendant tried alone were unavailable in a joint trial," we vacated the convictions of the co-defendants and remanded for a new trial. *Id.* at 1047 (*citing Zafiro v. United States,* 506 U.S. 534, 113 S. Ct. 933 (1993)) (emphasis added).

The appellants' reliance on *Neal* is misplaced. In *Neal,* the district court was presented with far more than the conclusory, non-incriminating affidavit offered by Billie Mac; in that case, the defendant gave extensive, specific, and detailed exculpatory testimony. The *Neal* co-defendants suffered specific and compelling prejudice because their trial had not been severed and the

**25**

testimony never heard. Here, the appellants did not suffer prejudice since the affidavit did not contain any specific exculpatory testimony. *See United States v. Dillman,* 15 F.3d 384 (5th Cir.), *cert. denied,* ___ U.S. ___, 115 S. Ct. 3010 (1992) (no abuse of discretion in denying severance because of the lack of candor reflected in Dillman's affidavit on behalf of his co-defendants and because the "affidavit was in no sense self-incriminatory; it was in fact self-serving . . . .").

Billie Mac's self-serving, non-incriminating affidavit offered no evidence that would exculpate the other defendants and, like that in *Dillman*, did not justify severance. The district court did not abuse its discretion when it denied this motion.

### D. *Gaudin* Error

All of the appellants urge that the Supreme Court's recent decision in *United States v. Gaudin,* ___ U.S. ___, 115 S. Ct. 2310 (1995), requires reversal of their convictions. In *Gaudin,* the Supreme Court held that where materiality is an element of the charged offense, the trial court's failure to submit the question of materiality to the jury violates the defendant's Fifth and Sixth Amendment rights. *Id.* at 2320.

In the present case, the district court instructed the jury on Counts 3, 5, 7, and 10, but *not* on Count 2, that they "need not consider whether the false statement was a material false statement, even though that language is used in the indictment. This is not a question for the jury to decide." The appellants contend that materiality was an element in each of their counts of

**26**

conviction and that their constitutional rights were violated when the district court failed to tender to the jury the question of materiality.

The effect of *Gaudin* error, if any, on the multiple verdicts against these defendants is difficult to unravel. Further, the implications of *Gaudin* are subject to dispute. Where materiality is an element of the charged crimes, including bank fraud and making false statements to a federally insured institution, *Gaudin* may cast doubt on the convictions. But as to all defendants except Billie Mac, our discussion is narrowed and simplified by the concurrent sentence doctrine, which holds that so long as a conviction of concurrent crimes can be sustained under any single court, the court need not address any other count. *See*, *e.g.*, *United States v. Strickland*, 509 F.2d 273 (5th Cir. 1975); *United States v. Rector*, 488 F.2d 1079 (5th Cir. 1973).

As to appellants Sutton, Taylor, Novoa and Stanley Jobe, any *Gaudin* error is rendered irrelevant by the convictions under Count 2 of the indictment for aiding and abetting Billie Mac to commit bank fraud. The government contends, and appellants' counsel conceded at oral argument, that an aiding and abetting conviction does not require proof of materiality, even though the underlying offense of bank fraud requires such proof. To aid and abet an offense, the appellants must share in the criminal intent of the principal and assist the principal's perpetration of a crime. Sutton, Taylor, Novoa and Stanley posit, however, that under the peculiar facts of this case, a necessary finding of

materiality is imbedded in all of their Count 2 convictions. Their assertion is based on the fact that Count 2 expressly incorporates paragraph seventeen from Count 1[17]; the Count 2 reference to Count 1 somehow infused it with a materiality requirement for aiding and abetting Billie Mac's bank fraud. This argument is meritless. Paragraph seventeen of Count 1 described the expanded check kite and explained that the kiting scheme was "aided by the occasional deposit of loan proceeds that were obtained fraudulently and used in place of an insufficient check deposit." This language in no way implied that the remaining appellants had to commit fraud in order to aid and abet Billie Mac's bank fraud. Not only is materiality not an issue prerequisite to the Count 2 convictions; those convictions are otherwise properly pleaded and proved against the aiders and abettors.

To secure the Count 2 convictions, the government had to prove "beyond a reasonable doubt that the defendant[s] willingly associated [themselves] with a criminal venture and participated therein as something [they] wanted to bring about. Aiding and abetting means to assist the perpetrator of a crime." *Cloud,* 872 F.2d at 850. Furthermore, "an abettor's criminal intent may be inferred from the attendant facts and circumstances and need not be established by direct evidence." *Id.*

From all of the evidence and testimony presented to the jury in this case, a rational trier of fact could have decided that

_____

[17]    As discussed earlier, Count 1 charged the appellants with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344, 1005, 1014, and 371.

**28**

the remaining appellants aided and abetted Billie Mac's bank fraud. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). The jury could have rationally concluded that these appellants had an intent to defraud the banks by facilitating Billie Mac's bank fraud. In *United States v. Knipp,* 963 F.2d 839, 846 (6th Cir. 1992), the Sixth Circuit affirmed the defendant's aiding and abetting bank fraud conviction where the defendant "allowed . . . [the] overdrafts to continue and that he facilitated the kite to cover them because the overdrafts amounted to huge, unauthorized loans beyond the single customer legal lending limits . . . ." The evidence in the instant case demonstrates that the remaining appellants facilitated Billie Mac's kite in similar and, indeed, more extensive ways. *See also, United States v. Sims,* 895 F.2d 326 (7th Cir. 1990) (finding that the defendant acted with the intent to defraud was sufficient to sustain his conviction for aiding and abetting attempts to commit a wire fraud against a bank). Because the Count 2 convictions must be affirmed against these appellants without regard to *Gaudin* error, there is no need to discuss the other concurrent counts of conviction against them.

Gaudin cannot be wholly avoided as to Billie Mac's Count 2 conviction, however, because his conviction for bank fraud does require a finding of materiality as an element of that offense. *See, e.g., United States v. Spears,* 49 F.3d 1136, 1141 (6th Cir. 1995) ("the determinative factor is the making of the materially false statement with the intent to influence the lender."); *United States v. Davis,* 989 F.2d 244, 247 (7th Cir. 1993) ("a

misrepresentation must be material in order to give rise to liability under the bank fraud statute.").

But even this conclusion does not require reversal of Billie Mac's conviction under Count 2. Billie Mac did not object to the district court's failure to instruct the jury on materiality. As a result, this court reviews his *Gaudin* claim for plain error. *See, e.g., United States v. Keys,* 67 F.3d 801 (9th Cir. 1995) (applying plain error analysis and affirming the conviction). Under plain error review, Billie Mac must pass three tests before this court can consider reversal: (1) there was an error; (2) it was clear or obvious; and (3) this error affected the substantial rights of the petitioner. *United States v. Calverley,* 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc) (*citing United States v. Olano,* ___ U.S. ___, 113 S. Ct. 1770, 1776-79 (1993)), *cert. denied,* ___ U.S. ___ 115 S. Ct. 1266 (1995). The Supreme Court has, however, explained that even if these factors are established, a court need not exercise its discretion to correct the error unless it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Olano,* 113 S. Ct. at 1778. Even if we assume that *Gaudin* error was plain because it became so while the case was on appeal, and even if we assume that failure to instruct the jury was a "structural error" such that Billie Mac is not required to show prejudice, *see Keys, supra*, 67 F.2d at 810-11, we may still exercise discretion not to reverse the conviction. After carefully considering the record, this court declines to exercise our discretion to correct the *Gaudin* error for Billie Mac

30

by authorizing a new trial. The evidence against him was overwhelming. Billie Mac has not challenged its sufficiency on appeal. Denying him the formality of a new trial does not effect a fundamental miscarriage of justice. As a result, Billie Mac's conviction and sentence on Count 2 are affirmed. The *Gaudin* error does not mandate reversal on a plain error standard in this case.

## II. Appellants' Individual Challenges to their Convictions[18]

### A. Stanley's Challenges to the Sentence Enhancements

The district court imposed two different sentence enhancements on Stanley. The first of these is a two-level enhancement imposed under U.S.S.G. § 3B1.1(c) for Stanley's supposed efforts as a manager or supervisor of criminal activity.

Stanley argues that the district court clearly erred when it imposed this enhancement on him because there was no evidence to support the requisite finding under § 3B1.1(c) that he managed or supervised criminal activity. Moreover, the Presentence Report ("PSR"), on which the district court relied, incorrectly concludes that his position as a director of two of the banks involved in the kiting scheme demonstrates that he managed or supervised the criminal activity.

As this court has frequently explained, the decision to enhance a sentencing guideline will be upheld if it "results from a legally correct application of the Guidelines to factual findings that are not clearly erroneous." *United States v. Sherrod,* 964

---

[18] Of course, this court will only address those individual challenges that are relevant to a conviction under Count 2.

F.2d 1501, 1506 (5th Cir. 1992), *cert. denied, sub. nom, Cooper v. United States,* ___ U.S. ___, 113 S. Ct. 832 (1992).  Also, a PSR "generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making the factual determinations required by the guidelines."  *United States v. Elwood,* 999 F.2d 814, 817 (5th Cir. 1993).

Nevertheless, a thorough review of the record lends no support to the district court's finding that Stanley somehow managed or supervised the criminal activity.  According to *United States v. Ronning,* 47 F.3d 710, 711-12 (5th Cir. 1995), § 3B1.1(c) requires that a defendant be the organizer or leader of at least one other participant in the crime and that he assert control or influence over at least that one participant.[19]  There is no evidence that Stanley managed or supervised any of his co-defendants or any other people in connection with the illegal acts.  Absent such evidence, this court must vacate his sentencing enhancement under § 3B1.1(c).

The second sentence enhancement imposed on Stanley is not as problematic.  Under that enhancement, the district court increased Stanley's offense level two levels because it found that he had "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the

---

[19]  This is the requirement under § 3B1.1(c) for enhancing Stanley's sentence.  As will be discussed later, however, this enhancement is also applicable if the defendant exercised "management responsibility over the property, assets, or activities of a criminal organization."  *See* USSG § 3B1.1(c), comment., n.2.

**32**

commission or concealment of the offense . . . ." § 3B1.3.  This provision

> encompasses two factors: (1) whether the defendant occupies a position of trust and (2) whether the defendant abused her position in a manner that significantly facilitated the commission or concealment of the offense.  To determine whether the position of trust "significantly facilitated" the commission of the offense, the court must decide whether the defendant occupied a superior position, relative to all people in a position to commit the offense, as a result of her job.

*United States v. Fisher,* 7 F.3d 69, 70-71 (5th Cir. 1993).

Stanley raises a litany of challenges to this enhancement.  For instance, he contends that his ordinary, commercial relationships with the lenders were not trust relationships; that, although he did have a position of trust with two of the banks involved, he did not use this position to further his father's activities; that his acquisition of a loan was not an abuse of trust; that the Deer Creek Spice loan was from CNB where he occupied no position of trust; and that mere knowledge of his father's activities did not constitute an abuse of trust.  While the record is admittedly close on this issue, Stanley's PSR found that Stanley was present at an EPSB meeting with bank examiners in early 1991 and was advised at this meeting of his father's check kiting scheme.  Also, he was apprised of Billie Mac's overdrafts that had been covered by wire transfers on the Jobe Concrete Products account at FNPB.  As discussed earlier, Stanley was on the board of directors at both EPSB and FNPB.  Hence, there is some evidence to support the district court's finding that  Stanley

occupied positions of trust at both banks and used these positions to facilitate or conceal his father's check kiting scheme.  Given this evidence, sentence enhancement under § 3B1.3 for abuse of trust was not clearly erroneous.

### B.    Novoa's Separate Challenges

#### 1.    *Bruton* Claims

Novoa contends that the district court improperly denied his motion to sever, violating his Sixth Amendment right to confrontation as this right was explained by the Supreme Court in *Bruton v. United States,* 391 U.S. 123, 88 S. Ct. 1620 (1968).  This court has interpreted *Bruton* to provide that a defendant's Sixth Amendment right to confrontation is violated when "(1) several co-defendants are tried jointly, (2) one defendant's extrajudicial statement is used to implicate another defendant in the crime, and (3) the confessor does not take the stand and is thus not subject to cross-examination."  *United States v. Restrepo,* 994 F.2d 173, 186 (5th Cir. 1993).  *Bruton* can be violated when a co-defendant's statement "directly alludes to the complaining defendant."  *United States v. Beaumont,* 972 F.2d 91, 95 (5th Cir. 1992) (*quoting United States v. Webster,* 734 F.2d 1048, 1054 n.6 (5th Cir. 1984), *cert. denied, sub. nom, Hoskins v. United States,* 469 U.S. 1073, 105 S. Ct. 565 (1984)).  However, severance is proper only in cases where a "defendant's statement *directly incriminates* his or her co-defendants *without reference to other, admissible evidence."  Id.* (emphasis added).

34

Novoa argues that the admission of certain statements by Taylor, through bank examiner Burress, and statements by Billie Mac, through Hale, the credit manager and vice-president of Jobe Concrete Products, violated his Sixth Amendment right to confront witnesses.[20]  Neither Taylor nor Billie Mac testified at trial.

The first statement to which Novoa objects under *Bruton* was a statement by Taylor made through bank examiner Burress.  At trial, Burress testified as follows:

> Mr. Taylor indicated that on December 29th, the date that check was issued, the cashier, Fernando Novoa, presented him with a check . . . .
>
> That Fernando Novoa presented the check for him to sign.  Mr. Taylor signed the check without verifying that there [sic] collected funds in the account sufficient to pay for the check.  His stated reason was that he had faith in the cashier that that was okay . . . .
>
> Next, he indicated he asked -- When he was told that the transaction was illegal, he asked cashier Fernando . . . Novoa what happened, what was the reason for this, and he did not get an answer . . . .
>
> Stephen Taylor indicated that he felt like Fernando Novoa had some checks in his drawer that were written by Billie Mac Jobe until January 4th, the date that the cashier's check was paid for.[21]

Prior to this testimony, Novoa's counsel objected that the testimony was not admissible as an exception to the hearsay rule

---

[20]    Both of these statements were highlighted and noted in our earlier discussion of the factual background.

[21]    As was noted earlier, Taylor retracted this allegation in a subsequent conversation with Burress.

under Fed. R. Evid. 801(d)(2)(E).[22]  The trial judge then asked Novoa's counsel whether he was asking that the statement not be considered against his client, and Novoa's counsel responded, "Absolutely."  The district court then issued a limiting instruction to the jury that it must consider this testimony only as to Taylor.

Novoa correctly contends that the district court's limiting instruction in this case was powerless to rectify an actual *Bruton* error.  *Cruz v. New York,* 481 U.S. 186, 190, 107 S.Ct. 1714, 1717-18 (1987).  Hence, if the admission of Taylor's statements through Burress violated *Bruton,* the district court's limiting instruction was ineffective.

But Taylor's statements did not violate Novoa's Sixth Amendment right to confront witnesses as this right was explained in *Bruton*.  The statements did not directly incriminate Novoa without reference to other admissible evidence.  *See Beaumont,* 972 F.2d at 95.  The only potentially incriminating statement by Taylor suggested that Novoa kept Billie Mac's checks in his drawer until the date on which the cashier's check was paid.[23]  At best, this statement was a tentative opinion by Taylor, one that he later

---

[22]    Novoa had, of course, also moved for severance prior to trial.

[23]    Although Novoa suggests that Taylor's statements also accuse Novoa of having dishonestly orchestrated an 'illegal' insufficient cashier's check transaction for Jobe, there is no support for this in the record.  At most, Taylor suggests that Novoa could not explain why the cashier's check was not posted on bank records for several days.  This in no way directly incriminates Novoa.

retracted; Burress' testimony included Taylor's retraction of his statement. Taken as a whole, none of Taylor's statements through Burress directly incriminated Novoa, so these statements did not run afoul of *Bruton*.

Furthermore, because the statements did not directly incriminate Novoa without reference to other admissible evidence, the court's limiting instruction is adequate to protect Novoa from any potential prejudice. As this court recently explained in *United States v. Leal,* ___ F.3d ___, 1996 WL 30673, *5 (5th Cir. 1996),

> [t]he Supreme Court has held that the admission of a nontestifying defendant's confession is permissible if the trial court gives a proper limiting instruction. *Marsh v. Richardson*, 481 U.S. 200, 107 S. Ct. 1702 (1987). This Court has held that a *Bruton* problem arises *only when the statements clearly implicate the codefendant. United States v. Kelly,* 973 F.2d 1145 (5th Cir. 1992). Furthermore, even if a *Bruton* violation occurs, 'the error may be harmless if the statement's impact is insignificant in light of the weight of other evidence against the defendant.'

(citation omitted)(emphasis added). In *Leal,* as in the instant case, the proffered statements did not clearly implicate the codefendant and since "[t]here was no direct implication . . . the limiting instruction was adequate to prevent prejudice." *Id.* Given both the nature of the proffered statements and the court's limiting instruction, this court concluded in *Leal* as we do now, that "[t]he district court acted well within its discretion in denying the motion to sever trials." *Id.*

The second statement to which Novoa objects was a statement by Billie Mac through Hale. At trial, Hale testified as follows:

> I'm uncertain as to the time, but I did have a conversation with Mr. Jobe about deposit slips at El Paso State Bank . . . .
>
> He told me that he was receiving immediate credit via deposit slips that have been encoded to provide that . . . .
>
> [By "encoded"] I believe he was referring to the micro encoding at the bottom of the deposit slips . . . .
>
> Fernando Novoa [was the person at El Paso State Bank who 'had worked it so that he could receive immediate credit with the encoding] . . . .

Careful review of the record demonstrates that Novoa did not object to this testimony.[24]

Although this testimony is admittedly incriminating to Novoa and might raise *Bruton* concerns, as has been previously explained, because Novoa failed to object to this testimony, this court will review for plain error. After carefully considering the underlying record, this court declines to exercise its discretion to correct whatever *Bruton* error this testimony might contain. Even if this court were to grant Novoa's objection to the statements of Billie Mac through Hale and strike these statements from the record, the evidence is nonetheless more than sufficient

---

[24] Earlier in the testimony, Novoa had objected that the government's question inquiring about a period of time, "[b]efore Fernando Novoa came to work for Mr. Billie Mac Jobe and his entities," assumed facts not yet in evidence, but this objection did not relate to the testimony about which Novoa alleges *Bruton* error; no objection was raised to that testimony.

to affirm Novoa's conviction and sentence under Count 2 for aiding and abetting bank fraud. Given the other, admissible evidence against Novoa, any *Bruton* error would be harmless, so this court's refusal to rectify it through plain error review does not cause a miscarriage of justice. *See, e.g., U.S. v. Kelly,* 973 F.2d 1145 (5th Cir. 1992) (applying harmless error analysis to an alleged *Bruton* error); *U.S. v. Cartwright,* 6 F.3d 294, 300 (5th Cir. 1993) (holding that no plain *Bruton* error occurred when the evidence of guilt was overwhelming).

### 2. Sentence Enhancements

Novoa contends that the district court erred in applying a two level enhancement under § 3B1.1(c) discussed above because he did not manage or supervise any other criminal participant in the check-kiting scheme. He also argues that the district court was clearly erroneous when it refused to grant him a reduction in sentence under § 3B1.2 for his status as a minimal or minor participant in the check kite.

To support his argument that the § 3B1.1(c) enhancement was erroneous, Novoa relies on the language in the commentary accompanying that section that indicates that he must supervise, manage, or control another co-defendant in order to qualify for the enhancement. However, as this court explicitly recognized in *Ronning,* "[t]he note recognizes an exception to the control requirement if a defendant exercises management responsibility over a criminal organization's property, assets, or activities." *Ronning,* 47 F.3d at 711. Indeed, the note expressly provides that

**39**

> [a]n upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

USSG § 3B1.1(c), comment., n.2.

Because of this exception to the control requirement, the district court was not clearly erroneous when it imposed a two-level sentence enhancement on Novoa under § 3B1.1(c). Novoa exercised management responsibility over the Jobe accounts in both his capacity as EPSB cashier and as head of the wire transfer room. Evidence at trial also suggested that Novoa authorized multiple transfers for Billie Mac on uncollected funds, made it possible for Billie Mac to receive immediate credit on deposits by using special, endorsed deposit slips, and circumvented not only the proof machine's calculation of the float, but also other bank records through the use of special transaction codes. Novoa exercised management responsibility over the Jobe accounts so as to justify a two-level enhancement under § 3B1.1(c).

Novoa also claims that the district court was clearly erroneous when it failed to grant him a sentence reduction under § 3B1.2. This section provides that

> [b]ased on the defendant's role in the offense, decrease the offense level as follows: (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels; (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels. In cases falling between (a) and (b), decrease by 3 levels.

**40**

USSG § 3B1.2. On appeal, Novoa claims that he was entitled to a two-level downward adjustment as a "minor participant." The government counters that Novoa has waived this claim since he argued at sentencing for a four-level downward adjustment for his role as a "minimal participant."

The record supports the government's claim that Novoa sought the four-level downward adjustment at sentencing rather than the two-level reduction given to a "minor participant." While this court could conclude that Novoa has waived his claim for treatment as a "minor participant," the district court's denial of this two-level reduction was nonetheless proper because there was ample evidence in the record to support the conclusion that Novoa was more than a minor participant in Billie Mac's check kiting scheme.

## CONCLUSION

For the foregoing reasons, this court AFFIRMS the convictions of all of the appellants, VACATES Stanley's managerial or supervisory sentencing enhancement, and REMANDS Stanley for resentencing.

CONVICTIONS **AFFIRMED** AS TO ALL DEFENDANTS; SENTENCE OF STANLEY JOBE **VACATED** AND **REMANDED**.