UNITED STATES COURT OF APPEALS
For the Fifth Circuit

--------------------------------------------------------

No. 95-21077

--------------------------------------------------------


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

GERALD PATRICK HARRIS,

Defendant-Appellant.


-------------------------------------------------------------------------------------------------------

Appeals from the United States District Court
for the Southern District of Texas, Houston Division

-------------------------------------------------------------------------------------------------------

January 22, 1997

Before DAVIS and DUHE, Circuit Judges, and DOWD,[1] District Judge.

DOWD, District Judge:

Appellant Gerald Patrick Harris challenges his conviction and sentence for being an accessory after the fact to a bank robbery culminating in the murder of a woman at the robbers' rendezvous point, a cemetery. For reasons set forth below, we affirm the conviction and remand the case for resentencing.


I.      *Background Facts*

A dozen Houston-area conspirators traveling in three cars entered the town of Normangee, Texas, on August 23, 1994, with plans to rob the Normangee State Bank. The

_____

[1] District Judge for the Northern District of Ohio, sitting by designation.

appellant's brother, Gary Harris, was one of the conspirators. Proceeding according to a plan conceived the previous day, seven conspirators entered the bank while the other five waited outside in three getaway cars. Those in the bank brandished weapons, forced occupants to the floor, ransacked the safe and fled with more than $171,000 in cash. When they exited the bank, only one of the three getaway cars remained. The seven piled into the car, a Honda Civic, and drove to a pre-planned rendezvous point, Hopewell Cemetery at the edge of town. The two other getaway cars were not there, but the conspirators spotted a small car in the cemetery occupied by Ruby Parker, 82 years old, who was visiting her husband's grave. The leader of the conspiracy, Julius Sephus, got out of the Civic, approached Parker's car and demanded she exit her vehicle. When she did not comply immediately, Sephus shot Parker in the head with a .45 caliber handgun, killing her. The conspirators fled the cemetery, some in the Civic and some in Parker's vehicle.

One of the getaway cars which had not stayed around, occupied by two conspirators, Marquez Jones and Rodolfo Alonzo Jr., was pulled over a few moments later by Leon County Sheriff Royce Wilson. While the sheriff searched the two males, Jones grabbed the sheriff's weapon. Jones and Alonzo got back into their vehicle and fled. A few minutes later the two encountered a road block set up by state troopers. Jones, who was driving, sped through the road block while Alonzo fired in the direction of state troopers, striking Trooper Stephen Bynum in the shoulder. Jones and Alonzo were apprehended a few miles down the road after their car sustained a flat tire, making it no longer operable.

Eventually all twelve conspirators were apprehended, charged and convicted on federal charges related to the bank robbery. Three more persons, including the appellant, were charged with being an accessory after the fact to bank robbery in violation of 18 U.S.C. § 3. The appellant

was further charged with receiving money stolen from a bank in violation of 18 U.S.C. § 2113(c). The appellant was jointly tried with Rosa Linda Cabezuela Thomas (the mother of two of the conspirators) in an eight-day trial. The jury acquitted Thomas and convicted the appellant on both counts.

It is undisputed that the appellant had no knowledge of the robbery until after several of the conspirators returned to Houston hours after the crime. There is also little material dispute as to the actions taken by the appellant in the following several days. What the appellant does dispute is his state of mind prompting his actions.

The afternoon of the robbery, the appellant drove his two small children to the apartment complex where his brother, Gary Harris, lived. Unknown to the appellant, the conspirators had planned the robbery at his brother's apartment the night before. The appellant testified he intended to ask his brother to attend a movie but found no one home. However, in the parking lot the appellant met two conspirators, Steven Thomas and Demetrius Guzman, who recognized him as Gary Harris' brother. Thomas had a key to the apartment, and the appellant and his children entered the apartment with Thomas and Guzman. The appellant testified he entered because Thomas showed him what he believed to be a gun underneath his shirt and he felt threatened. Once inside, the appellant was told of the robbery and that "Jay [Sephus] shot somebody," according to Guzman's testimony. (R.8 at 7). The appellant, Thomas and Guzman cleansed the apartment of incriminating evidence such as identification cards, pagers, bullets, a gun and a bloodstained blanket from Parker's car.

Embreall Victorian, the girlfriend of Steven Thomas, stopped by the apartment later. She testified the appellant was in charge of the cleaning project and was giving orders to others.

3

Ultimately a bag of incriminating evidence was placed in the trunk of the appellant's car. Victorian testified that she accompanied the appellant, his children, Thomas and Guzman in the appellant's car. They picked up a pizza and traveled to the appellant's apartment. Later the appellant and Guzman left the apartment to find a location to burn the personal items, leaving the appellant's children with Thomas and Victorian. The items were doused with lighter fluid purchased by the appellant and Guzman at a convenience store a few minutes earlier and were burned. The appellant acknowledges selecting the location for burning the items.

The appellant drove Guzman to several other locations that night, including a Long John Silver restaurant at which the two met briefly with the appellant's brother. Ultimately the appellant, along with Guzman, Thomas and Victorian,[2] traveled to another apartment where they met Sephus. At that location the money was divided into shares. Those who entered the bank were to receive $17,000 apiece while the drivers of the cars were to get $8,000. The appellant neither requested nor was given a share. However, according to the testimony of Guzman and Victorian, he was given money to distribute to his brother and to Jerelene Valverde, who was the driver of the Honda Civic which transported the robbers to the cemetery.

Valverde, who had pleaded guilty to charges related to being a driver in the robbery, testified she had received $4,000 earlier in the day. She testified that while she and the appellant were gathered with others at the apartment of a mutual friend later in the day, the appellant told her she was supposed to have received $8,000. She said he promised to get the other $4,000 from Sephus and in fact did return to the apartment later that night with the additional sum.

---

[2] By this time the appellant's wife had arrived home from work and taken the children from the care of Thomas and Victorian to another location.

4

Guzman testified that he went with the appellant to deliver the additional $4,000 to Valverde before returning to the appellant's apartment where the appellant, Guzman and Thomas spent the night.

Guzman and Thomas left the appellant's apartment the next morning. Guzman was arrested a few hours later at his parents' home. Thomas disappeared and was not found for two weeks, whereupon he was arrested. Victorian, Thomas' girlfriend (who was not charged), returned to the appellant's apartment the day after the robbery to retrieve some belongings. She told the appellant the FBI had contacted her and was asking her about Thomas' whereabouts. She testified the appellant told her she did not have to talk to the FBI and that if she revealed information "that would be my [Victorian's] butt." (R. 3 at 82). The appellant admitted making the statement but said he was not threatening her; rather, he was stating that her boyfriend, whom Victorian acknowledged was abusive, would harm her if she turned him in.

The only testimony at trial that the appellant received more than a few dollars from the robbery[3] was provided by Diron Oliver, a friend of Thomas. Oliver, who had pleaded guilty to receiving stolen money pursuant to a plea agreement, testified that he gave Thomas a ride to the appellant's apartment the afternoon following the robbery. On the way to the apartment, they spotted the appellant driving in his car. They got his attention and both cars stopped on the side of a street. Oliver testified the appellant took a gym bag out of his car's trunk and handed it to Thomas. He testified further that Thomas opened the bag, took out approximately $3,000 and gave it to the appellant. (R.4 at 120).

---

[3] Victorian testified she saw Sephus give the appellant a small amount of money she estimated at less than $100. The appellant testified Sephus gave him $30 or $40.

The appellant denied receiving any money from the bank robbery other than $30 or $40 from Sephus and contends that his participation after the fact was prompted by fear of his own life and the lives of his children. He said Guzman and Thomas were frenzied and out of control on the day of the robbery and that he felt he could not escape the situation without jeopardizing himself or his family. The trial judge instructed the jury on the defense of duress. However, after two days of deliberations the jury convicted the appellant of both accessory after the fact and receiving money stolen from a bank.

On appeal, the appellant asserts five errors. First, he argues the evidence was insufficient to sustain the guilty verdict. Second, he argues the jury instructions on accessory after the fact omitted a necessary element of the offense, i.e., that the underlying crime was a federal offense. Third, he argues the district court failed to respond adequately when the jury posed a question on the defense of duress during deliberations. Fourth, he argues that the district court misapplied the federal sentencing guidelines. Finally, he argues his counsel was ineffective, both at trial and at sentencing. We will consider each assertion in order.

II.     *Sufficiency of the Evidence*

It is hornbook law that an attack on the sufficiency of the evidence to sustain a criminal conviction is judged from the standpoint of whether, after viewing all evidence presented and all inferences that may reasonably be drawn from the evidence in the light most favorable to the prosecution, any reasonable jury could have found that the defendant was guilty beyond a reasonable doubt. See, e.g., U.S. v. Triplett, 922 F.2d 1174, 1177 (5th Cir.), cert. denied, 500 U.S. 945, 111 S.Ct. 2245, 114 L.Ed.2d 486 (1991); Glasser v. United States, 315 U.S. 60, 80, 62

S.Ct. 457, 469, 86 L.Ed. 680 (1942). "The evidence need not 'exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.'" Triplett, 922 F.2d at 1177 (quoting United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), aff'd on other grounds, 462 U.S. 36, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).

To support a conviction of accessory after the fact, the government must have proved beyond a reasonable doubt that 1) Guzman and Thomas committed a bank robbery in violation of federal law; and that 2) the appellant, knowing Guzman and Thomas robbed a bank, provided relief, comfort, or assistance 3) for the purpose of hindering or preventing apprehension, trial or punishment.[4]

The testimony offered by Guzman, Valverde, Victoria and the appellant himself supports a jury finding beyond a reasonable doubt on each of these elements. Guzman and Valverde testified as to the details of the bank robbery. Guzman testified he and and Thomas told the appellant shortly after seeing him that they had robbed a bank and that a person had been shot in the aftermath. The appellant admits he helped remove incriminating evidence from the apartment where the robbery had been planned, placed the incriminating items in the trunk of his car, and drove Guzman to a site to burn the items.

The appellant's entire defense is wrapped in his argument that his admitted activities were the result of duress. A jury had the opportunity to consider that defense in light of all of the

---

[4] 18 U.S.C. § 3 provides: "Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact."

7

circumstances in an eight-day trial. Clearly, however, there was ample evidence upon which the jury could have rejected the appellant's defense and concluded that the facts constituted willing and voluntary assistance to the conspirators after the fact. "A reviewing court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Wright v. West, 505 U.S. 277, 296-97, 112 S.Ct. 2482, 2492, 120 L.Ed.2d 225 (1992) (quotation omitted). Given our deferential standard of review, the evidence in the record clearly is sufficient to support the conviction. The same is true for conviction on the count of receiving money known to have been stolen from a bank. The appellant admits to having received such money, at least as a carrier and deliverer to conspirators. The jury's conviction on the count means it rejected his duress defense, a conclusion based upon sufficient evidence in the record.

III.    *Failure to Instruct on Whether Underlying Crime Was Federal Offense*

The appellant argues that the trial judge failed to instruct the jury on a necessary element of accessory after the fact, i.e., that the underlying crime was a *federal* offense. The trial judge instructed the jury with respect to the elements as follows:

> For you to find each defendant guilty of this crime as charged in Count One of the indictment, you must be convinced that the Government has proved each of the following beyond a reasonable doubt. First, that each defendant knew that Demetrius Guzman, Steven Thomas, Gary Harris, or others, had committed the crime of bank robbery.
>
> And second, that thereafter, each defendant comforted, assisted, received, or relieved, Demetrius Guzman, Steven Thomas, Gary Harris, or others.

8

And third, that each defendant did the above, intending to hinder or prevent the apprehension, trial, or punishment, of Demetrius Guzman, Steven Thomas, Gary Harris, or others.

(R.13 at 105). Thus the trial judge's only reference to the underlying crime was simply calling it a "bank robbery" without further definition or instruction that the robbery must be a federal offense.[5]

The appellant argues that under United States v. Gaudin, _ U.S. _, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), it was error not to require the jury to find that the bank robbery was a federal offense. The Supreme Court in Gaudin reversed criminal fraud convictions because the judge had not submitted the issue of materiality, conceded by the Government to be an element of the charged offense, to the jury. The Supreme Court emphasized that the Fifth and Sixth Amendments require criminal convictions to be supported by a jury determination that the defendant is guilty of every element of the crime with which he is charged. Gaudin, _ U.S. at _, 115 S.Ct. at 2313. The appellant argues that the first element of accessory after the fact requires the establishment of an offense "against the United States" and that the jury did not pass on that issue.

---

[5] However, the trial judge did instruct the jury that a conviction on the charge of receiving stolen money in violation of 18 U.S.C. § 2113(c) required a finding that the bank was federally insured. (R.13 at 108). Thus there is no question the instruction on that count contained the requisite federal underpinnings.

9

We will assume without deciding that the trial judge erred by merely requiring a finding of a bank robbery, as opposed to a finding of a federal crime.[6]   Nonetheless, we find such an error does not require reversal.

Because the appellant's counsel failed to object to the instruction as written, we believe the plain error standard of review should apply.   It is true that counsel for the codefendant did argue that the instruction should require the jury to find that the underlying crime was a federal offense. (R.13 at 93-94).  However, the objection of one defendant, in and of itself, does not preserve the appellate rights of other defendants.  Fed.R.Crim.Proc. 30 states, "No party may assign as error any portion of the charge or omission therefrom unless *that party* objects thereto . . ." (emphasis added).  The appellant cites no authority to support the proposition that he can assert the rights of his codefendant.  Indeed, the greater weight of authority counsels that a party can rely upon the objection of his codefendant only if he joins in the objection.  See, e.g., United States v. Bernal, 814 F.2d 175, 181-82 (5th Cir. 1987) (codefendant's objection was expressly joined by defendant); United States v. Pincione, 565 F.2d 404, 405 (6th Cir. 1977) (defendant specifically incorporated codefendant's objections); Freije v. United States, 386 F.2d 408, 411 n.7 (1st Cir. 1987) (codefendant's objection was "echo[ed]" by defendant).[7]

---

[6] We find differences between the instant case and Gaudin, in which the trial judge clearly omitted an element of the charged crime, i.e., materiality.  In this case, the trial judge did not omit the first element of accessory after the fact; the judge merely failed to define the element completely.  Although the instruction required the jury to find a bank robbery had been committed, it did not require a finding that robbing the bank was a federal crime.  Such an error, arguably involving the "sub-elements" of an otherwise established element, is not of the same degree as a Gaudin-type complete omission of an element.

[7] See also United States v. Salinas, 601 F.2d 1279, 1282 n.7 (5th Cir. 1979) (district court expressly stated that objection by any defendant's counsel would accrue to the benefit of all defendants), amended on other grounds, 610 F.2d 250 (5th Cir. 1980).  But see United States v.

10

In the instant case, rather than joining his codefendant's objection, the appellant's counsel told the trial judge, "I don't have any objections to the charge." (R.13 at 94). Having chosen not to object or at least to join his codefendant's objection, the appellant did not preserve the issue for appeal, leaving us to examine the instruction only for plain error.

Under the plain error standard as articulated in Fed.R.Crim.Proc. 52(b) and case law, this court may reverse the conviction only if 1) there was an error, 2) the error was clear and obvious, and 3) the error affected a defendant's substantial rights. United States v. Olano, 507 U.S. 725, 730-31, 113 S.Ct. 1770, 1775-76, 123 L.Ed.2d 508 (1993). We will assume for purposes of this discussion that the trial court's failure to specify that the underlying conviction must be for a federal offense was a clear and obvious error. We find that the error did not affect the appellant's substantial rights.

The Supreme Court noted in Olano that in most cases, for an error to be deemed to have affected substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." Id. at 734, 113 S.Ct. at 1778. In the instant case the failure to specify the federal nature of the underlying bank robbery offense cannot be construed to have affected the jury's verdict. The rendering of the guilty verdict means the jury found that the appellant knew that the conspirators committed a bank robbery. Having made such a finding, no properly instructed and rational jury would have concluded that the bank robbery was not a federal offense. The bank's vice president testified that the deposits of the Normangee State Bank were federally insured. (R.9 at 131). The federal insurance is the trigger conferring federal status

Lefkowitz, 284 F.2d 310, 313 n.4 (2d Cir. 1960) (after two defendants objected to instruction and were overruled, it was not necessary for third defendant to raise same issue to preserve appellate rights).

11

to the crime.  See 18 U.S.C. § 2113(f).   The appellant's counsel chose not to cross-examine the vice president on the issue of the federally insured nature of the bank, nor did the appellant contest the federal nature of the underlying crime in any other way.

Simply put, the failure to instruct the jury that the underlying crime must be a federal offense worked no prejudice on the appellant.  Thus the error did not "affect substantial rights" and does not warrant reversal.[8]

We are compelled to make one final point before putting this issue to rest.  We discussed the implications of Gaudin and Olano recently in United States v. Jobe, _ F.3d _, 1996 WL 700146 (5th Cir. 1996).  In Jobe, under a plain error standard of review, we held that the failure to instruct on materiality in a bank fraud instruction did not require reversal, even assuming that such failure affected the appellants' substantial rights.  Jobe, _ F.3d at _, 1996 WL 700146 at *14.  We relied upon the reasoning of Olano that "Rule 52(b) is permissive, not mandatory."  Olano, 507 U.S. at 735, 113 S.Ct. at 1778.  We said in Jobe that "an appellate court need not exercise discretion to correct the error unless it seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Jobe, _ F.3d at _, 1996 WL 700146 at *14.

We declined to exercise such discretion in Jobe because of the substantial expenditure of government resources, the overwhelming nature of incriminating evidence, and the fact that materiality was never seriously contested by the defendants at trial.  Id.   Likewise in the instant

---

[8] We acknowledge that the Supreme Court in Olano declined to decide "whether the phrase 'affecting substantial rights' is always synonymous with 'prejudicial.'" Olano, 507 U.S. at 735, 113 S.Ct. at 1778.  It stated that there "may be" a "special category of forfeited errors that can be corrected regardless of their effect on the outcome."  Id.  We are confident that if there is such a "special category," it is not implicated in the instant case in which the error was little more than hypertechnical, given the unchallenged evidence that the robbed bank was federally insured.

12

case, even if we were to have found that the error in instructions impacted the appellant's substantial rights, we would not have chosen to exercise our discretion to reverse the conviction on that basis. A jury found the appellant guilty after an eight-day trial during which the federal nature of the underlying crime was never contested by the appellant or his codefendant. We decline to reverse on the basis of an error that had no effect on the "fairness, integrity, or public reputation" of the underlying proceedings. Jobe, supra.

IV.     *Response to Jury's Question*

The appellant argues the trial court committed reversible error in responding to the jury's question during deliberations regarding the defense of duress. Our standard for evaluating responses to jury questions was set forth in United States v. Stevens, 38 F.3d 167 (5th Cir. 1994): "When evaluating the adequacy of supplemental jury instructions, we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it." Id. at 170 (citing United States v. Natale, 764 F.2d 1042, 1046 (5th Cir. 1985)).

The trial judge had instructed the jury prior to deliberations as follows:

It is the theory of the defense in this case that although Gerald Harris may have committed the acts charged in the indictment, he did not do so voluntarily, but only because of force or cohesion in the form of intimidation and threats of bodily harm to himself or his family.

As you have already been instructed[,] intent is an essential element of the crime charged in the indictment, and acts done involuntarily because of cohesion are not done intentionally. In order to excuse an act that would otherwise be criminal, however, the intimidation or cohesion must be (1) present and immediate, and (2) must be of such a nature that it induces a reasonable and well-founded fear of death or serious bodily injury to one's self or someone else; and (3) there must be

13

no reasonable opportunity to escape from cohesion without participating in the crime.

(R.13 at 108-09). During deliberations, the jury submitted a note stating the following:

One of our group has brought up the consideration that the fear of death/serious bodily injury could have been perceived as lasting after the opportunity to escape. Therefore, that fear would be enough to excuse participation in the crime. After the escape -- meaning fear of retaliation against self/family from Steven Thomas or any of his friends.

(R.14 at 3).

After consulting with counsel for all sides, the trial judge elected to simply refer the jury back to its original instruction. The appellant's counsel agreed with the trial court's decision. (R.14 at 5). Thus the decision to refer the jury to the original instruction is reviewed only for plain error. United States v. Calverley, 37 F.3d 160, 162 (5th Cir. 1994) (en banc), cert. denied, --- U.S. ---, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995).

To justify an instruction on duress, a defendant must show 1) he was under an unlawful, present, imminent and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; 2) he had not recklessly or negligently placed himself in such a situation; 3) he had no reasonable legal alternative to violating the law; and 4) there is a direct causal relationship between the criminal action taken and the avoidance of threatened harm. United States v. Harvey, 897 F.2d 1300, 1304-05 (5th Cir.), cert. denied, 498 U.S. 1003, 111 S.Ct. 568, 112 L.Ed.2d 574 (1990), overruled on other grounds, United States v. Lambert, 984 F.2d 658 (6th Cir. 1993). Applying these elements to the instant case, we find that the original instruction adequately stated the necessary elements of a duress defense.[9]

---

[9] If the instruction in the instant case was deficient, it was because it omitted one of the elements the appellant would have had to establish, i.e., that he did not negligently or recklessly

14

The jury's question in this case focused on the temporal factor of a duress defense, i.e., whether a duress defense was justified if the defendant was under a threat of harm which could occur after the opportunity to escape. The original instruction that the threat must be "present and immediate" was a correct statement of Fifth Circuit law on the point of the jury's inquiry. Thus the trial court's response was "reasonably responsive" to the jury's question, and the instructions as a whole "allowed the jury to understand the issue presented to it." United States v. Stevens, 38 F.3d at 170. There was no plain error.

V.    *The Three Sentencing Issues*

The presentence report placed the adjusted offense level at 35 based on a determination that the base offense level for the crime of accessory after the fact to a bank robbery involving a murder during the flight by the bank robbers was 30 plus an enhancement of three levels for the shooting of the state trooper by Alonzo and two levels for obstruction of justice. The district court approved the report. The district judge, noting that the appellant had no prior criminal record and appeared to be an otherwise productive member of society, sentenced him to 168 months, the minimum for level 35 under the guidelines.[10]

---

place himself in the allegedly untenable position. See United States v. Liu, 960 F.2d 449, 454 (5th Cir.) (submitted instruction was deficient because it contained no reference to defendant's burden to prove he did not negligently or recklessly place himself in position where he would be forced to choose criminal conduct), cert. denied, 506 U.S. 957, 113 S.Ct. 418, 121 L.Ed.2d 341 (1992). In other words, if anything, the instruction favored the appellant.

[10] The appellant also was sentenced to 120 months for his conviction for receiving money stolen from a bank, with the two sentences to be served concurrently.

A sentence based on the United States Sentencing Guidelines must be upheld unless the appellant demonstrates that it was imposed in violation of the law, was imposed as a result of an incorrect application of the guidelines, or was outside the range of the applicable guidelines and was unreasonable.  18 U.S.C. § 3742(e); United States v. Matovsky, 935 F.2d 719, 721 (5th Cir. 1991).

We hold that the district court was correct with respect to the base offense level, but erred in adding the five levels for the shooting of the state trooper and obstruction of justice.  Our analysis follows.

### 1.  The Applicable Base Offense Level for Accessory after the Fact in this Case.

The guideline for accessory after the fact calls for a base offense level of six levels below the offense level for the underlying offense, with the caveat that the maximum base offense level is 30.  U.S. Sentencing Guidelines Manual (hereinafter "USSG") at §2X3.1(a).  Application Note 1 to the guideline states as follows:  "'Underlying offense' means the offense as to which the defendant is convicted of being an accessory.  Apply the base offense level plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant; . . ."

The presentence investigation report found that the underlying offense was robbery, which under USSG §2B3.1(a) has a base offense level of 20.  The robbery guideline lists a series of specific offense characteristics at USSG §2B3.1(b).  The specific offense characteristics include an increase of two levels if a victim sustained bodily injury, four levels if a victim sustained serious bodily injury, and six levels if a victim sustained permanent or life-threatening bodily injury.  There

16

is no specific offense characteristic addressing the death of a victim. Instead, the guideline includes a cross reference, USSG §2B3.1(c), which states, "If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111[11] had such killing taken place within the territorial or maritime jurisdiction, apply §2A1.1 (First Degree Murder)."

Because of the murder of Parker in the aftermath of the bank robbery, the presentence investigation report recommended applying the cross-reference to the murder guideline. The base offense level for murder is 43. Because of the upper limit provision of the accessory after the fact guideline, the appellant's base offense level was set at 30.

We reject the appellant's first argument that he was wrongfully sentenced based upon a murder in which he did not participate. First, such an argument ignores the very nature of being an accessory "after the fact:" the criminal activity occurs *subsequent to* the underlying crime. The only rational way to punish for such an offense is to link the sentence to the underlying crime, albeit with reduced responsibility for the offender's lesser role. The sentencing guidelines, by imposing a base offense level six levels below the level for the underlying offense, with a maximum base offense level of 30, balances the reduced role for the after the fact offender with the severity of the underlying crime.

The appellant also misperceives the nature of his sentence. Contrary to his assertions, he was not sentenced for the murder itself; he was sentenced for assisting in preventing the apprehension of the conspirators responsible for the murder. The difference is more than academic. If the appellant truly were being sentenced for the murder, his base offense level would

_____

[11] 18 U.S.C. § 1111 defines murder. The definition includes a killing "committed in the perpetration of . . . robbery".

17

have been 43, pursuant to USSG § 2A1.1.  Instead, as an accessory, his base offense level was capped at 30, in recognition of the reduced responsibility of an accessory after the fact. [12]

We also reject the appellant's argument that a literal adherence to Application Note 1 of the accessory after the fact guideline, quoted on page 16 supra, allows the district court to add specific offense characteristics to the base level but does not permit using a guideline's cross-reference to enhance a sentence even further.  Following such a path would lead to an obvious anomaly: a court could enhance a sentence if a victim were seriously (or even slightly) injured but could not enhance a sentence if a victim died.  A common-sense interpretation of the guidelines requires the conclusion that the accessory after the fact application note did not intend such a result.  Consequently, we find the district court correctly determined the base offense level.

2.  The Three-Level Enhancement.

Paragraph 196 of the presentence investigation report recommends adding three levels as a victim-related adjustment pursuant to U.S.S.G. §3A1.2(a), the "official victim" section of the

---

[12] There is support in the Fifth Circuit for sentencing based upon the murder guideline despite not participating in the murder.  In United States v. Salinas, 956 F.2d 80 (5th Cir. 1992), the appellant was convicted of perjury and misprision of felony for denying to investigators and a grand jury he knew anything about a murder when in fact he knew of the murder and the persons who committed it.  He was sentenced under the "accessory after the fact" guideline with the underlying offense as murder.  This is because the perjury guideline (§2J1.3(c)(1)) states that the accessory after the fact guideline should be applied if the perjury involved a criminal offense.  The Fifth Circuit held the sentencing proper, saying, "Section 2J1.3(c)(1) does not require that the defendant actually be convicted of the underlying offense or as an accessory to the underlying offense."  Id. at 83.  There was no indication the appellant knew of the murder in advance or even acted as an accessory after the fact, yet it was permissible to sentence him under the guideline for accessory after the fact for murder.

guidelines.[13]  There is no further explanation of the adjustment in the 40-page report.  Because the

only "official victim" of the crime was Trooper Bynum, we presume the recommendation was

based on his injuries.[14]

The appellant's counsel objected to this enhancement.  The district judge, in overruling the

objection, mistakenly referred to the enhancement as a "vulnerable victim" adjustment and cited the

"vulnerable victim" guideline (Section 3A1.1)[15] rather than the "official victim" guideline:

---

[13] Section 3A1.2, labeled "Official Victim," reads as follows:

> If --
>
> (a) the victim was a government officer or employee; a former
> government officer or employee; or a member of the immediate
> family of any of the above, and the offense of conviction was
> motivated by such status, or
>
> (b) during the course of the offense or immediate flight therefrom,
> the defendant or a person for whose conduct the defendant is
> otherwise accountable, knowing or having reasonable cause to
> believe that a person was a law enforcement or corrections officer,
> assaulted such officer in a manner creating a substantial risk of
> serious bodily injury,
>
> increase by **3** levels.

[14] The shooting of Trooper Bynum was discussed briefly at page 2 <u>supra</u> and also is described
at paragraphs 22-24 of the presentence investigation report.

[15] Section 3A1.1, the "vulnerable victim" guideline, appears immediately prior to the "official
victim" guideline in the sentencing guidelines.  The "vulnerable victim" guideline reads as follows:

> If the defendant knew or should have known that a victim of the
> offense was unusually vulnerable due to age, physical or mental
> condition, or that a victim was otherwise particularly susceptible to
> the criminal conduct, increase by **2** levels.

19

> You have also objected to the three level increase for the *vulnerable victim* under *3A1.1A* [16] in paragraph 196 of the presentence report, . . . I think that the adjustment for the *vulnerable victim* has been appropriately and correctly applied. The Court therefore overrules that objection.

(Sentencing transcript, R.17 at 2) (emphasis added). The trial judge did not state further why she believed the "vulnerable victim" enhancement should be provided. The only crime victim arguably meriting "vulnerable" status would be the elderly Parker.

We conclude based upon this limited dialogue in the record that the district court, in purportedly "adopting" the presentence investigation report, believed the adjustment was being applied because of the murder of the Parker, pursuant to §3A1.1, rather than the shooting of Trooper Bynum, pursuant to §3A1.2. [17]

Thus the record reveals a conflict. On the one hand, the district court announced it was adopting in full the presentence investigation report, which included an "official victim" enhancement under §3A1.2(a). On the other hand, in adopting that enhancement, the court referred to §3A1.1, the "vulnerable victim" provision. Therefore, it is unclear whether the appellant's sentence was enhanced due to the "vulnerable victim" status of Parker or the "official victim" status of Trooper Bynum. We find it unnecessary to resolve this question because an enhancement based upon the victim status of either victim is erroneous.

---

[16] There is no "3A1.1A" in the sentencing guidelines. This is an apparent reference to Section 3A1.1, the vulnerable victim provision.

[17] If the district court intended to apply the "vulnerable victim" adjustment of §3A1.1 rather than the "official victim" adjustment of §3A1.2, it erred by adding three levels rather than two. Compare §3A1.1 (two-level enhancement for "vulnerable victim") to §3A1.2 (three-level enhancement for "official victim").

With respect to Parker, at the time the appellant became an accessory, he was told that the conspirators had robbed a bank and "Sephus shot somebody." (R.8 at 7). Contrary to the requirements of §3A1.1, he neither knew nor should have known that person who had been shot was unusually vulnerable. The appellant thus lacked the requisite *mens rea* to support enhancement based upon the vulnerability of Parker.

With respect to Trooper Bynum, we find more confusion due to imprecise or inaccurate references to the sentencing guidelines. The presentence investigation report recommended enhancement based upon §3A1.2(a). However, it is clear that §3A1.2(b), addressing assaults on law enforcement officials while fleeing from a crime, is more applicable to the circumstances surrounding the shooting of Trooper Bynum.[18] The latter subsection calls for enhancement only if the person inflicting injury is the defendant "or a person for whose conduct the defendant is otherwise accountable." The shooting of Trooper Bynum was committed by Alonzo in conjunction with Jones. The record does not support the conclusion that the appellant had any relationship with Alonzo and Jones which would make him accountable as an accessory after the fact for the acts of these two conspirators, who were in custody before the appellant even knew of the robbery.[19]

---

[18] Section 3A1.2 is quoted in full at note 13 <u>supra</u>.

[19] The United States filed a post-argument brief listing several citations to the 17-volume record purportedly supporting the district court's enhancement of the sentence based upon the shooting of Trooper Bynum. Most of these are references to testimony that the appellant was present when news reports on the robbery were televised. Even if this were sufficient to establish that the appellant at some point after his original involvement became aware of the shooting -- a questionable prospect -- it does not establish that the appellant was "accountable" for the actions of the conspirators with whom he had no contact and whom he did not assist.

21

Thus enhancement based upon §3A1.2(b) would have been inappropriate. Enhancement based upon §3A1.2(a), as recommended in the presentence investigation report, also would be erroneous because the appellant's "offense of conviction," i.e., accessory after the fact, was not motivated by the government employee status of Trooper Bynum.

### 3. The Obstruction of Justice Enhancement.

The addition of two levels for obstruction of justice was also erroneous. Application Note 6 to §3C1.1, the obstruction of justice guideline, states the following:

> Where the defendant is convicted for an offense covered by . . . §2X3.1 (Accessory After the Fact), . . . this adjustment is not to be applied to the offense level for that offense except where a significant further obstruction occurred during the investigation, prosecution, or sentencing *of the obstruction offense itself* (e.g., where the defendant threatened a witness during the course of the prosecution for the obstruction offense).

(emphasis added). The purpose of this limitation is to "avoid double counting by preventing a person from being convicted of a crime and receiving an adjustment for the same conduct." United States v. Bell, 953 F.2d 6, 7 n.1 (1st Cir. 1992) (quotation omitted). Importantly, the application note counsels that the obstruction warranting the enhancement must be distinguishable from the obstruction inherent in being an accessory after the fact.

The presentence investigation report recommended adding the two levels for obstruction of justice because the appellant 1) burned evidence, 2) hid money and 3) told Embreall Victorian that if she cooperated with the FBI it would "be her butt," a statement she took as a "threat and a warning by [the appellant]." (Report at ¶¶ 185-87). Contrary to the direction of Application Note 6, there was no apparent attempt in the presentence report or by the district court to

22

determine whether such acts constituted a "significant further obstruction" over and above the accessory offense itself. Indeed, none of the conduct cited in the presentence investigation report appears distinguishable from the conduct upon which the accessory after the fact charge was based. Nor did the conduct occur during the "investigation, prosecution, or sentencing of the obstruction offense itself"; rather, it occurred during the investigation of the *underlying* offense of bank robbery resulting in murder. In sum, the facts as outlined in the presentence investigation report and adopted by the district court do not constitute the distinctive conduct necessary to support an obstruction of justice enhancement to a conviction based upon being an accessory after the fact.

Accordingly, we remand this case to the district court for resentencing without enhancements for victim-related adjustment or obstruction of justice.

*VI.     Ineffective Assistance of Counsel*

Finally, the appellant argues his trial counsel was ineffective during both the trial and sentencing phases in the district court. A claim of ineffective assistance of counsel will succeed only upon a showing that 1) counsel's performance was deficient and 2) the deficiency was prejudicial to the defendant. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

As for complaints of ineffective assistance during trial, even if the appellant could establish the first part of the Strickland test, he cannot establish that the outcome of the trial would have

23

been different.  Under <u>Strickland</u>, a court must consider "the totality of the evidence before the ... jury" to determine prejudice.  <u>Id.</u> at 695, 104 S.Ct. at 2069.  As discussed previously, there was ample evidence upon which to base the appellant's conviction.

The appellant argues further that, given the evidence the jury considered his duress defense at length, his counsel should have moved for downward departure based upon coercion or duress as permitted under USSG §5K2.12.  That section permits downward departure if the defendant acted "because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense."  Presumably the district court was aware of this guideline. The district court also was aware the jury rejected the appellant's claims in this respect.  Having presided over the trial, there is no reason the district court could not, *sua sponte,* have granted a downward departure based upon coercion or duress if it deemed such a departure appropriate. Therefore the failure of the appellant's counsel to move for such a departure is not prejudicial.

*VII.    Conclusion*

For the foregoing reasons, we affirm the conviction of the appellant and vacate the sentence imposed by the district court.  We remand for resentencing without enhancements for vulnerable or official victim or for obstruction of justice.